841 F.2d 908
 18 Collier Bankr.Cas.2d 560, 17 Bankr.Ct.Dec. 611,
Bankr. L. Rep. P 72,218
 In re Thomas G. KELLY III and Pauline A. Kelly, Debtor.
Robert W. and Carolyn B. ZOLG and Tucson Realty & Trust
Company, Appellants,
and
United States of America, Intervenor,
v.
Thomas G. KELLY III and Pauline A. Kelly, Appellees,
and
Alan Solot, Trustee in Bankruptcy.
 No. 87-1560.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 13, 1987.
Decided March 2, 1988.
 
 Michael McGrath, Stompoly & Stroud, Tucson, Ariz., for appellants.
 Thomas G. Kelly III, Blaser, Kelly & Don, Tucson, Ariz., for appellees.
 Scott A. Harbottle, Civil Div., Dept. of Justice, Washington, D.C., for intervenor.
 Appeal from the Bankruptcy Appellate Panel for the Ninth Circuit.
 Before SCHROEDER, POOLE and KOZINSKI, Circuit Judges.
 KOZINSKI, Circuit Judge:
 
 
 1
 We consider whether the bankruptcy appellate panel erred in reversing the bankruptcy court's dismissal of appellees' chapter 7 bankruptcy petition as a "substantial abuse" of the Bankruptcy Code.
 
 Background
 
 2
 Robert and Carolyn Zolg sold their home to the Kellys; Tucson Realty acted as the real estate agent for this transaction. Subsequently, the Kellys sued the Zolgs and Tucson Realty, charging fraud and breach of contract and seeking damages for loss of the benefit of their bargain, repairs to the house, punitive damages and attorney's fees. On September 6, 1983, the Arizona Superior Court found for the defendants on all counts and awarded them attorney's fees and costs in the amount of $16,369.90, plus interest from the date of judgment.
 
 
 3
 The Kellys appealed. In lieu of a supersedeas bond, as called for by Arizona law, they posted security in the form of a $17,056.90 irrevocable reserve against their home equity credit line with the Valley National Bank (VNB). The Arizona Superior Court stayed execution on the judgment until December 31, 1984, when the line of credit was scheduled to expire, but the court's order provided that the stay would remain in effect thereafter if the credit agreement was extended. Clerk's Record (CR) 15 exh. C. VNB promised to extend the agreement for an additional year if the Kellys' credit remained satisfactory, and the line of credit was in fact so extended. CR 15 p 6 & exh. B.
 
 
 4
 The Arizona Court of Appeals affirmed the judgment against the Kellys on February 8, 1985, and awarded defendants an additional $5,610.73 in attorney's fees and costs. Not long thereafter, without notifying defendants or seeking permission from the court, Kelly instructed VNB to cease holding the reserve for the Zolgs and Tucson Realty. Excerpt of Record (ER) at 61-62, 79.
 
 
 5
 The Arizona Supreme Court denied the Kellys' petition for review on June 12, 1985. Having exhausted all recourse in the state courts, the Kellys turned to the federal courts, filing a petition for relief under chapter 7 of the Bankruptcy Code. In their petition the Kellys listed $181,350 in assets, $147,000 in debt secured by mortgages against their home, and $25,000 in unsecured debt owed to the Zolgs, Tucson Realty, and the other defendants in the original state court action. Before filing for bankruptcy, the Kellys paid off all their other unsecured creditors, consolidating some of this debt into their secured line of credit with VNB. ER at 67a, 69-70; CR 18 at 38-46. Shortly after filing this petition, Kelly sold back his one-third interest in his law firm, Blaser, Kelly & Don, P.C., for the nominal sum of $100.
 
 
 6
 On August 30, 1985, Kelly was examined pursuant to Bankruptcy Rule 2004. Thereafter, on October 16, 1985, the bankruptcy judge on his own motion held a hearing to determine whether the Kellys' petition should be dismissed under 11 U.S.C. Sec. 707(b). The court found that the Kellys owed "primarily consumer debts" and that granting their petition would be a "substantial abuse" of the Code because they could easily pay all of their debts. Accordingly, the bankruptcy court dismissed the petition. The Kellys moved for reconsideration, and after a second hearing on January 13, 1986, the court reaffirmed the dismissal. In re Kelly, 57 B.R. 536 (Bankr.D.Ariz.1986) (Scanland, J.).
 
 
 7
 The Kellys appealed, arguing (1) that section 707(b) is unconstitutional; (2) that they did not have "primarily consumer debts" because most of their debts were secured by real estate mortgages; and (3) that their ability to repay all their unsecured debts was irrelevant to the question of whether granting their petition would be a "substantial abuse." The BAP agreed with the second contention and reversed. Kelly v. Solot (In re Kelly), 70 B.R. 109 (Bankr. 9th Cir.1986). The Zolgs and Tucson Realty in turn appealed to this court, and the United States intervened to defend the constitutionality of section 707(b).
 
 I. Jurisdiction
 
 8
 Our jurisdiction over appeals from the BAP is limited to "appeals from all final decisions, judgments, orders and decrees." 28 U.S.C. Sec. 158(d) (Supp. III 1985). In determining whether a decision is final, "[w]e look, first, to see whether the order of the bankruptcy court was final, and second, to whether the decision of the BAP is final. Both decisions must be final." King v. Stanton (In re Stanton), 766 F.2d 1283, 1285 (9th Cir.1985) (citations and footnote omitted). Turning first to the bankruptcy court's order, it is obvious that a dismissal of a debtor's bankruptcy petition is final, terminating, as it does, all litigation in the case. The more difficult question is whether the BAP's reversal of that dismissal is also final.
 
 
 9
 A decision affirming or reversing a final order of a bankruptcy court is also deemed final for purposes of appealability. In re Stanton, 766 F.2d at 1287. However, where the BAP remands for further factual findings on "a central issue," the decision is not appealable, because review of such decisions would violate the traditional "policy disfavoring piecemeal appeals." Id.
 
 
 10
 Here, the BAP reversed a final order of the bankruptcy court and remanded for "a determination of the nature of the unsecured debt" and for reconsideration of the proper test for substantial abuse. 70 B.R. at 112, 113. The latter question is clearly one of law. As for the former, the only matter left unresolved was whether appellants' judgment for attorney's fees qualifies as a "consumer debt" under 11 U.S.C. Sec. 101(7). Since the underlying facts are not disputed,[1] the question is one in which legal issues predominate and is thus subject to de novo review. United States v. McConney, 728 F.2d 1195, 1199-1204 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The policies of judicial efficiency and finality are best served by our resolving the question now.
 
 II. Section 707(b) Dismissal
 
 11
 Title III of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 98 Stat. 355 (the 1984 Act) added the so-called consumer credit amendments to the Bankruptcy Code as it had been originally enacted by the Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, 92 Stat. 2549 (the 1978 Act). Included in these amendments was new subsection 707(b), which provided:
 
 
 12
 After notice and a hearing, the court, on its own motion and not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter . There shall be a presumption in favor of granting the relief requested by the debtor.
 
 
 13
 11 U.S.C. Sec. 707(b) (Supp. III 1985).[2] The Kellys dispute the applicability of this provision to their case.
 
 A. Primarily Consumer Debts
 
 14
 1. The first question we must address is whether some or all of the Kellys' debts constitute "consumer debts" within the meaning of the Code. As an initial matter, the Kellys argue that debts secured by real property are never consumer debts, relying on floor statements made in the House and Senate prior to the enactment of the 1978 Act. See 124 Cong.Rec. S17,406 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini) ("[a] consumer debt does not include a debt to any extent the debt is secured by real property"); 124 Cong.Rec. 32,393 (1978) (statement of Rep. Edwards) (same). Since approximately 85 percent of the Kellys' debt is secured by real property (their home), they contend that they cannot have "primarily consumer debts" and thus are exempt from dismissal under section 707(b).
 
 
 15
 This argument stands the process of statutory interpretation on its head, resorting to legislative history without first considering the language of the statute. As the Supreme Court has noted, "legislative history, ... by traditional canons of interpretation[,] is irrelevant to an unambiguous statute." United Air Lines, Inc. v. McMann, 434 U.S. 192, 199, 98 S.Ct. 444, 448, 54 L.Ed.2d 402 (1977); accord Valentine v. Mobil Oil Corp., 789 F.2d 1388, 1391 (9th Cir.1986). Here, resort to legislative history is not appropriate because the statutory language is clear and precisely addresses this situation.
 
 
 16
 The Code defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. Sec. 101(7) (1982). "Debt" means "liability on a claim," 11 U.S.C. Sec. 101(11) (1982), and "claim," in turn, is broadly defined as any "right to payment, whether or not such right is ... secured, or unsecured." 11 U.S.C. Sec. 101(4)(A) (1982) (emphasis added). A literal reading of the Code's simple language leads inexorably to the conclusion that consumer debt includes secured debt. Indeed, section 521(2) of the Code, also added by the 1984 Act, makes special provision for "consumer debts which are secured by property of the estate," an unambiguous indication that Congress intended that the "secured or unsecured" language of the definition apply to consumer debts.
 
 
 17
 Nor is there any indication that debts secured by real property are to be treated differently. To the contrary, section 524 of the Code explicitly recognizes that consumer debt may be secured by real property, making different provisions for the reaffirmation of consumer debt depending on whether or not it is "consumer debt secured by real property." 11 U.S.C. Secs. 524(c)(6)(B), (d)(2) (Supp. III 1985). The statutory scheme so clearly contemplates that consumer debt include debt secured by real property that there is no room left for any other conclusion. See 4 Collier on Bankruptcy p 707.06, at 707-16 (15th ed. 1987) (Collier ).[3]
 
 
 18
 The Kellys argue that this interpretation would render petitions of most consumer debtors subject to dismissal, because most consumers have the largest portion of their debt secured by real property. Such policy arguments are, of course, beside the point once Congress has spoken. In any event, the argument is spurious. The existence of substantial consumer debt does not, in itself, result in dismissal. The court may dismiss the petition only if granting relief would be a "substantial abuse." Those debtors who are, for no fraudulent or improper reasons, truly in need of a "fresh start" will not be subject to 707(b) dismissal. This is precisely what Congress had in mind. See pp. 913-14 infra.[4]
 
 
 19
 2. While secured debt is not automatically excluded from consumer debt, it is not automatically included either. We must look to the purpose of the debt in determining whether it falls within the statutory definition. Of the Kellys' mortgage debts, $95,000 consists of a lien they assumed in purchasing their home and $32,000 represents a home equity line of credit incurred for home improvements and the repayment of credit card debts. ER at 102; CR 18 at 38-43. All these fit comfortably within the Code's definition of consumer debt.[5] It is difficult to conceive of any expenditure that serves a "family ... or household purpose" more directly than does the purchase of a home and the making of improvements thereon.
 
 
 20
 The Kellys also claim to have a second home equity line of credit on which they owe approximately $20,000. The sole evidence concerning the nature of this debt is Kelly's affidavit which describes it as securing a loan from VNB to his professional corporation. Debt incurred for business ventures or other profit-seeking activities is plainly not consumer debt for purposes of section 707(b). In re Bell, 65 B.R. 575, 577 (Bankr.E.D.Mich.1986).
 
 
 21
 The Kellys' only remaining debt is the $25,000 they owe to the Zolgs and Tucson Realty for attorney's fees incurred in the state court litigation. That lawsuit was commenced by the Kellys for the purpose of recovering money allegedly overpaid in purchasing their home. The litigation thus served primarily a "family" or "household" purpose within the meaning of section 101(7). A debt for attorney's fees incurred in attempting to further this purpose, like any other debt so incurred, qualifies as a consumer debt.
 
 
 22
 The ultimate question we must decide under section 707(b) is, of course, whether debtors have "primarily consumer debts." "Primarily" means "for the most part." Webster's Ninth New Collegiate Dictionary 934 (1984). Thus, when "the most part"--i.e., more than half--of the dollar amount owed is consumer debt, the statutory threshold is passed. Here that standard is easily met. Of the Kellys' $172,000 indebtedness, $152,000 (approximately 88 percent) is consumer debt. They have primarily consumer debts within the meaning of section 707(b).
 
 B. Substantial Abuse
 
 23
 1. The second prerequisite to dismissal under section 707(b) is a finding that granting the debtor's petition would be a "substantial abuse" of chapter 7. With the singular exception of the BAP below, the unanimous conclusion of bankruptcy courts has been that the principal factor to be considered in determining substantial abuse is the debtor's ability to repay the debts for which a discharge is sought. See, e.g., In re Walton, 69 B.R. 150, 154 (E.D.Mo.1986); In re Cord, 68 B.R. 5, 7 (Bankr.W.D.Mo.1986); In re Gaukler, 63 B.R. 224, 225 (Bankr.D.N.D.1986); In re Kress, 57 B.R. 874, 878 (Bankr.D.N.D.1985); In re Hudson, 56 B.R. 415, 419 (Bankr.N.D.Ohio 1985); In re Grant, 51 B.R. 385, 391 (Bankr.N.D.Ohio 1985); In re Edwards, 50 B.R. 933, 936-37 (Bankr.S.D.N.Y.1985); In re White, 49 B.R. 869, 874 (Bankr.W.D.N.C.1985); see also In re Bryant, 47 B.R. 21, 24-26 (Bankr.W.D.N.C.1984) (dismissing petition where debtor was able to pay debts and had not truthfully reported his financial condition); 4 Collier p 707.07 (primary factor is ability to repay debts; other factors include failure to fully disclose financial condition and indication that debtor has not suffered any calamity but merely desires to avoid paying debts); 3 Collier p 521.06, at 521-26. In determining ability to pay, courts have looked to the debtor's ability to fund a chapter 13 plan. See, e.g., Walton, 69 B.R. at 154; Hudson, 56 B.R. at 420; Grant, 51 B.R. at 391.
 
 
 24
 The Kellys point to the legislative history of the statute which they claim demonstrates that ability to pay is not a relevant consideration in determining substantial abuse. See 130 Cong.Rec. S7624 (daily ed. June 19, 1984) ("under [the 1984 Act], the availability of bankruptcy relief would not be limited by a future earnings standard") (statement of Sen. Metzenbaum); 130 Cong.Rec. H7489 (daily ed. June 29, 1984) ("the Consumer Credit amendments ... contain no threshold or future income test") (statement of Rep. Rodino).[6] Even if such floor statements were indicative of legislative intent, but see p. 912 n. 3 supra, the Kellys misinterpret these statements and the intent of Congress in passing the 1984 Act.
 
 
 25
 The consumer credit amendments approved by Congress in 1984 were adapted from provisions first proposed in an earlier Senate bill, S. 445. As originally introduced in February 1983, S. 445 contained a formula for determining the precise point where a debtor's ability to pay some debts would preclude chapter 7 relief. As a result of efforts by Senator Metzenbaum and others, however, this formula was eliminated by the Senate Judiciary Committee in favor of the substantial abuse formulation which was ultimately adopted and codified by the 1984 Act as section 707(b). The statements cited by the Kellys referred to the fact that the bill no longer contained a threshold formula; they do not suggest that a debtor's ability to repay his debts is no longer the primary consideration in determining whether there is abuse. Indeed, the committee report on the final version of S. 445[7] states clearly that dismissal for substantial abuse is intended to "uphold[ ] creditors' interests in obtaining repayment where such repayment would not be a burden," and that "if a debtor can meet his debts without difficulty as they come due, use of Chapter 7 would represent a substantial abuse." S.Rep. No. 65, 98th Cong., 1st Sess. 53, 54 (1983). Accordingly, we hold that the debtor's ability to pay his debts when due, as determined by his ability to fund a chapter 13 plan, is the primary factor to be considered in determining whether granting relief would be a substantial abuse.
 
 
 26
 2. The rule adopted by the overwhelming majority of the courts considering the issue appears to be that a debtor's ability to pay his debts will, standing alone, justify a section 707(b) dismissal. See Cord, 68 B.R. at 7 (debtors who are able to pay their debts neither need nor deserve protection of chapter 7); Hudson, 56 B.R. at 419 (substantial abuse occurs whenever debtor has ability to repay substantial portion of his debts under chapter 13); Edwards, 50 B.R. at 937 (ability to pay principal amount of debts in three years is per se substantial abuse).[8] We find this approach fully in keeping with Congress's intent in enacting section 707(b), and accordingly adopt it. This is not to say that inability to pay will shield a debtor from section 707(b) dismissal where bad faith is otherwise shown. But a finding that a debtor is able to pay his debts, standing alone, supports a conclusion of substantial abuse.
 
 
 27
 The Kellys are clearly able to repay their debts. They admitted to an excess of income over expenses in the amount of some $440 per month, and the bankruptcy judge found that half of their claimed $500-per-month expenditure for "recreation" was excessive. 57 B.R. at 540.[9] Combining thesetwo figures, the court found that the Kellys could repay, out of disposable income, approximately 99 percent of their unsecured debt in only three years. Id. The bankruptcy court was amply justified in dismissing the petition under section 707(b) as a substantial abuse of chapter 7.
 
 III. Constitutionality of Section 707(b)
 
 28
 The Kellys raise various constitutional challenges to section 707(b). Although the BAP found it unnecessary to address these claims, it nonetheless opined that "[the Kellys'] due process arguments are troublesome." 70 B.R. at 110. We do not find them so.
 
 A. Vagueness
 
 29
 The Kellys first raise a volley of arguments to the effect that section 707(b) is void for vagueness. But laws that regulate economic activity not involving constitutionally protected conduct are subject to a quite lenient test for constitutional sufficiency. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982); Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). The Bankruptcy Code is such a law. In re Talmadge, 832 F.2d 1120, 1125 (9th Cir.1987). Considering the Kellys' contentions in this light, we find them to be lacking in merit.
 
 
 30
 1. The Kellys first argue that section 707(b) is constitutionally inadequate because it fails to require notice to the debtors that fully informs them of all the matters to be considered at the hearing and of the facts on which the court will rely in resolving them. This contention is frivolous. The due process clause requires only such notice as is "reasonably calculated ... to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Section 707(b) provides that the court may dismiss a petition under its provisions "[a]fter notice and a hearing," a phrase defined as "such notice ... and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. Sec. 102(1)(A) (1982). In conformity with these statutory and constitutional strictures, the bankruptcy judge gave the Kellys more than a month's notice, informing them of the hearing and the nature of the issue to be considered, and instructing them to "appear ... to show cause, if any they have, why such proceedings should not be dismissed." ER at 39. The Code provides for, and the Kellys received, constitutionally adequate notice.
 
 
 31
 The Kellys argue, however, that they were unable to ascertain what facts would be considered at the hearing. This contention is untenable. Section 707(b) permits dismissal only after the court finds that the debtor had "primarily consumer debts" and engaged in "substantial abuse." Both of these terms are defined by the Code, legislative history and case law; debtors are therefore on reasonable notice of the facts relevant to these determinations. Even if the Kellys had for some reason been unaware of the relevant considerations at their first hearing, they could not have remained in the dark by the time of the second hearing, held by the court in response to their motion for reconsideration. The Kellys had by then read the judge's original order dismissing their petition and therefore knew exactly the facts and law the court deemed relevant. The bankruptcy judge generously allowed them to present additional evidence at this hearing, but they chose to rely solely on previously submitted evidence and Kelly's affidavit.[10] Their argument that they were "placed ... in the untenable position of not knowing what evidence to present at the hearing ordered by the Court," Appellees' Answering Brief at 12, is quite simply disingenuous.
 
 
 32
 2. The Kellys also claim that section 707(b) is unconstitutionally vague because it fails to specify the procedures for the presentation of evidence and rebuttal of the statutory presumption in favor of granting relief. With respect to the presentation of evidence, the Bankruptcy Rules incorporate the Federal Rules of Evidence, as well as Federal Rules of Civil Procedure 43 and 44 governing precisely this issue. Bankr.R. 9017. As for the presumption, we are unable to discern any constitutional infirmity in leaving its application to the discretion of the trial court. The Kellys' claim to the contrary is entirely without merit.
 
 
 33
 3. The Kellys' final vagueness objection to section 707(b) is that the terms "primarily consumer debt" and "substantial abuse" are not adequately defined. Although they admit that "consumer debt" is defined in 11 U.S.C. Sec. 101(7), they argue that the definition is ambiguous because it fails to indicate whether mortgage debts are consumer debts. As discussed above, however, the statute addresses this point directly. See pp. 911-13 supra.
 
 
 34
 The term "primarily consumer debts" is not separately defined in the Code. But the Code does define "consumer debt," and the modifier "primarily" is not a word that is ambiguous or difficult to understand. The Constitution does not require the legislature to incorporate Webster's into each statute in order to insulate it from vagueness challenges.
 
 
 35
 The Code also contains no definition of "substantial abuse." As the United States points out in its brief as intervenor, however, the Supreme Court has upheld statutes that contain equally undefined standards of decision. See, e.g., Nash v. United States, 229 U.S. 373, 376-78, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913) ("unreasonable" restraints of trade). The legislative history of the statute clearly indicates that ability to repay debts is the primary factor to be considered in applying this phrase, and the bankruptcy courts have had no difficulty in fashioning a relatively uniform approach to resolving this question. See Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 593, 105 S.Ct. 3325, 3339, 87 L.Ed.2d 409 (1985) (statutory "term that appears vague on its face 'may derive much meaningful content from the purpose of the Act, its factual background, and the statutory context' ") (quoting American Power & Light Co. v. SEC, 329 U.S. 90, 104, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946)). As Kelly, an experienced lawyer, should well have known, section 707(b) is simply not void for vagueness.
 
 B. Due Process
 
 36
 The Kellys also object to the fact that, at the time their petition was filed, section 707(b) granted the bankruptcy judge sole discretion to institute dismissal proceedings.[11] They claim that this placed the court in an adversarial position, particularly because the presumption in favor of granting relief supposedly requires the court to come forward with evidence justifying dismissal. They rely on In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), which held that a judge could not try witnesses, who had appeared before him while he sat as a one-man grand jury, for criminal contempt based on the judge's own investigations, because "[h]aving been part of [the accusatory] process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." Id. at 137, 75 S.Ct. at 625-26.
 
 
 37
 The result in Murchison was based in part on the criminal nature of the proceedings, id., and in part on the fear that the extensive and often one-sided evidence presented in the secret grand jury proceedings could "weigh far more heavily with [the judge] than any testimony given in the open hearings," id. at 138, 75 S.Ct. at 626. Neither of these considerations is present in the bankruptcy context. Indeed, the authority granted the bankruptcy judge under section 707(b) is no different from that granted federal judges in a number of similar situations, none of which raises any due process concerns. See, e.g., Sacher v. United States, 343 U.S. 1, 9, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952) (upholding district court's imposition of criminal contempt sanctions, without hearing, on parties who committed disruptive conduct during trial before sanctioning judge); Clark v. Paul Gray, Inc., 306 U.S. 583, 588, 59 S.Ct. 744, 748, 83 L.Ed. 1001 (1939) (issue of subject matter jurisdiction raised sua sponte); Fed.R.Civ.P. 11 (court on its own motion may impose sanctions for frivolous pleadings); Fed.R.Civ.P. 12(h)(3) (court must sua sponte dismiss actions whenever it appears that subject matter jurisdiction is lacking); Fed.R.Civ.P. 16(f) (court on its own motion may impose sanctions for failure to comply with discovery orders); Fed.R.Crim.P. 42 (criminal contempt may be punished summarily at instance of judge; judge may preside at contempt hearing unless contempt charged "involves disrespect to or criticism of" that judge).
 
 
 38
 There is simply no basis for the Kellys' novel contention that a judge's power to order a hearing on the issue of dismissal denies debtors a neutral and impartial arbiter. As with sua sponte orders concerning jurisdiction, contempt and sanctions, the court acquires no stake in the litigation merely by ordering a hearing.
 
 
 39
 Our conclusion is not affected by the fact that the statute gives debtors the benefit of a presumption in favor of granting relief. This presumption does not place on the judge the burden of producing evidence. Rather, when the issue of section 707(b) dismissal is raised, the debtor and, if appropriate, other parties as well are free to present evidence on the relevant issues. The court remains at all times above the level of advocacy. Seen in this light, the presumption is in reality a caution and a reminder to the bankruptcy court that the Code and Congress favor the granting of bankruptcy relief, and that accordingly "the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present." 4 Collier Sec. 707.08, at 707-19.
 
 
 40
 It is ironic that the Kellys should be raising a constitutional objection to this provision. Congress carefully reserved to the court the power to institute such proceedings precisely to protect debtors from possible harassment by creditors. See 4 Collier p 707.05. Congress violated no constitutional protections in adopting this approach. Section 707(b) is constitutional on its face and as applied to the Kellys in this case.
 
 IV. Attorney's Fees
 
 41
 The Zolgs and Tucson Realty seek an award of attorney's fees against the Kellys for their bad faith in litigating this appeal. Because the Zolgs and Tucson Realty are appellants before us, we cannot award them fees under 28 U.S.C. Sec. 1912 (1982) (damages and costs may be allowed to prevailing appellees), or Federal Rule of Appellate Procedure 38 (fees may be awarded to prevailing appellees ). We decline to make such an award under 28 U.S.C. Sec. 1927 (1982) or our inherent equitable powers. We express no opinion, however, as to whether appellants may be entitled to an award of attorney's fees in the courts below.
 
 Conclusion
 
 42
 The judgment of the BAP is REVERSED and the case is REMANDED to the bankruptcy court for further proceedings in accordance with this opinion.
 
 
 
 [1]
 Although the bankruptcy court record does not contain a full exegesis of the factual setting giving rise to the litigation which resulted in the award of attorney's fees, we take judicial notice of the Arizona Court of Appeals' memorandum opinion setting forth the facts and issues in that case. Fed.R.Evid. 201
 
 
 [2]
 Section 707(b) was later amended by the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99-554, title II, Sec. 219(b), 100 Stat. 3101 (1986 Act), to permit the United States Trustee to request a dismissal hearing
 
 
 [3]
 Even if the statutory language were ambiguous, we would find the Kellys' analysis of the legislative history unconvincing. To the extent that legislative history may be considered, it is the official committee reports that provide the authoritative expression of legislative intent. Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984); Zuber v. Allen, 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969). The committee reports on the 1978 Act make no reference to the supposed exclusion of debt secured by real property from the definition of consumer debt. See S.Rep. No. 989, 95th Cong., 2d Sess. 22 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5808; H.R.Rep. No. 595, 95th Cong., 1st Sess. 309 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6266. Stray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted on the bill. The opposite inference is far more likely
 
 
 [4]
 In fact, it is the interpretation urged by the Kellys that would frustrate congressional intent. Since many debtors do have large mortgage debts, a blanket rule excluding such debt from the category of consumer debt would completely insulate a very substantial number of debtors from section 707(b) dismissal
 The BAP attempted to avoid this problem by excluding mortgage debt from the section 707(b) calculus altogether, and instead considering only the ratio of unsecured consumer debt to unsecured non-consumer debt. Nothing in the statute provides the slightest support for this approach. Bankruptcy judges have no more power than any others to ignore the plain language of a statute in order to reach a result more in keeping with their notions of equity. In re Shoreline Concrete Co., 831 F.2d 903, 905 (9th Cir.1987).
 
 
 [5]
 The Kellys argue that the $95,000 first mortgage is not to be counted in determining their total debt load because it is non-recourse. This contention is frivolous. The title to the Kellys' home is subject to this lien, and they make monthly payments on the debt. ER at 15, 64-65. Were they to default on such payments, the lienholder could sell their home in a foreclosure or trustee's sale to collect the $95,000. This clearly qualifies as a consumer debt within the meaning of 11 U.S.C. Secs. 101(4), (11)
 
 
 [6]
 As usual, the Congressional Record contains ample support on both sides of the issue. See, e.g., 130 Cong.Rec. H7499 (daily ed. June 29, 1984) (substantial abuse occurs if "the debtor is found capable of fulfilling the terms of a chapter 13 repayment agreement") (statement of Rep. Anderson); 130 Cong.Rec. S6090 (daily ed. May 21, 1984) (statement of Sen. Hatch); id. at S6087 (statement of Sen. Heflin); 130 Cong.Rec. H1808 (daily ed. March 21, 1984) (statement of Rep. Roukema); see also 4 Collier p 707.04, at 707-12 n. 4
 
 
 [7]
 There were no committee reports on the 1984 Act. Therefore, the report on S. 445 is the best available evidence of Congress' intent in enacting section 707(b)
 
 
 [8]
 But see In re Deaton, 65 B.R. 663, 664-65 (Bankr.S.D.Ohio 1986) ("the mere ability to fund a Chapter 13 plan is not sufficient to constitute 'substantial abuse' ")
 
 
 [9]
 The bankruptcy judge was, if anything, unduly generous in this regard. The sole support for the $500 figure was Kelly's explanation that this was for "going out to dinner, entertaining people[,] ... buying toys for the kids or going to the movies, that sort of thing." ER at 82. None of these items qualify as "reasonably necessary ... for the maintenance or support of the debtor or a dependent of the debtor," 11 U.S.C. Sec. 1325(b)(2)(A) (Supp. III 1985), and thus permitting a debtor to retain this income would be grounds for rejection of a chapter 13 plan. 11 U.S.C. Sec. 1325(b). The same test is appropriate in determining which of the expenses claimed by the debtor could in reality be devoted to debt servicing for purposes of determining the debtor's ability to repay his debts under section 707(b)
 
 
 [10]
 At this hearing, the following exchange took place:
 THE COURT: ... I would be willing to take any evidence you would want to give.
 MR. BREEN [attorney for Kellys]: Well, as far as the facts, Your Honor, we were satisfied with the affidavit of the Kellys explaining how the debt structure was, which was attached to the motion, and then the legal arguments about respective income.
 CR 38 at 4.
 
 
 [11]
 The Code was amended in 1986 to authorize United States Trustees to initiate such proceedings as well. See p. 911 n. 2 supra