Dissent by Judge Nguyen OPINION CHRISTEN, Circuit Judge: This case calls for the court to decide whether a housing loan, made by an employer to an employee as a key part of a compensation package, qualified as a non-consumer debt. If the loan was a non-consumer debt, the bankruptcy court properly denied Aspen Skiing Company’s motion to' dismiss the Cherretts’ Chapter 7 bankruptcy petition under 11 U.S.C. § 707(b)(1). On the other hand, if the loan was a consumer debt, the bankruptcy court erred by denying the motion to dismiss. The Bankruptcy Appellate Panel (BAP) affirmed the bankruptcy court, ruling that the bankruptcy court’s order was final and appealable and that there was sufficient evidence that the Cherretts incurred the loan for a non-consumer purpose. We have jurisdiction under 28 U.S.C. § 158(d), and we affirm the BAP. I. BACKGROUND A. Cherrett’s Employment with Aspen Paul Cherrett (Cherrett) began working in the hospitality industry in 1979. He spent approximately twenty-five years with the Four Seasons hotel chain, including five years at the Four Seasons in Jackson Hole, Wyoming. In December 2006, while Cherrett lived and worked in Jackson Hole, he heard about an open managerial position at Aspen Skiing Company (Aspen) in Colorado. He did not apply for the position because it. did not offer any new responsibilities compared to his job at the Four Seasons. Months later, in 2007, Cherrett learned that Aspen had created a new upper-management position with expanded responsibilities. He expressed interest to an executive search firm and interviewed for the job. Aspen offered Cherrett a position leading its hospitality division as a senior vice president heading up the expansion of Aspen’s “Little Nell Hotel” brand, Aspen’s prestigious “flagship property.” Cherrett understood that if the Little Nell Hotel expansion continued, he might have the opportunity to oversee brand development in Jackson Hole and move back to his home there. Cherrett also understood that if he accepted the position with Aspen, he would need to live near Aspen’s office in Colorado, at least initially. This represented a challenge because his daughter had two years of high school left, Cherrett and his wife did not want to relocate her to a new school, and in Cherrett’s view, the salary proposed by Aspen did not cover the high cost of living in the Aspen area nor offer sufficient incentive to disrupt his family’s life in Wyoming. The salary was not enough for him to afford to buy a home in Aspen, and rentals there were “few and far between” and also very expensive. In negotiations regarding compensation, Aspen eventually offered a $500,000 housing loan (Housing Loan) in addition to an annual salary of $300,000. The Housing Loan was interest-only for the first ten years and it was coupled with a bonus plan providing Cherrett a guaranteed annual bonus of up to $33,750 to cover the interest payments on the loan.' The annual bonuses were timed to coincide with the date the annual interest payments were due, ensuring that, for the first ten years, Cherrett would have no out-of-pocket expenses related to the loan. If Cherrett left his position for any reason other than death or disability within two years, he would have to repay the loan and pay Aspen an additional $140,000. He would have to pay $120,000 for leaving within three to four years; $100,000 for leaving within five to six years; and $80,000 for leaving within seven to eight years, Cherrett would not have to repay any additional interest on the loan if he continued to work for Aspen through 2015. Aspen estimated the value of the plan at $330,750 over a period of ten years. Only with the Housing Loan did Cher-rett find Aspen’s offer attractive enough to accept. He left his job and family in Jackson Hole, and purchased a condominium near Aspen for $995,000. The Housing Loan covered $500,000 of the purchase price, and Cherrett financed $417,000 with a loan from a market-rate lender. Cherrett’s wife and daughter remained at the family home in Jackson Hole so that his daughter could finish high school there. The condominium in Colorado was smaller than the family home in Jackson Hole and did not have enough space to accommodate Cherrett’s wife and two children. With hopes of relocating back to Jackson Hole to develop the Little Nell Hotel brand, Cherrett considered the Colorado condominium a “place holder” and only moved clothing and personal items there. He visited his home and family in Jackson Hole “at every opportunity,” returning for holidays, birthdays, anniversaries, and his daughter’s prom and high school graduation. He continued using financial institutions in Wyoming, and kept his vehicle registration there. In 2008, the economy crashed and Aspen abandoned plans to expand the Little Nell Hotel brand. It became clear that Aspen would not be relocating Cherrett back to Jackson Hole. So in 2009, after Cherrett’s daughter graduated from high school and moved away to college, his wife joined him in Colorado and they sold their home in Jackson Hole. In 2011, four years after joining Aspen, Cherrett resigned from his position. B. Bankruptcy Proceedings Cherrett and his wife filed a voluntary Chapter 7 bankruptcy petition on August 30, 2013. They owed Aspen $550,000 under the terms of the Housing Loan. Aspen filed a motion to dismiss the Chapter 7 petition for abuse under 11 U.S.C. § 707(b)(1). The statute allows a court to “dismiss a case filed by an individual debt- or under this chapter whose debts are primarily consumer debts ... if it finds that the granting of relief would be an abuse of the provisions of this chapter.” 11 U.S.C. § 707(b)(1). Aspen argued that because the Cherretts incurred the Housing Loan to purchase a personal residence, the debt was a consumer debt, and they were not entitled to Chapter 7 relief in light of their ability to pay their creditors in a hypothetical Chapter 13 plan.[1] The bankruptcy court held an evidentia-ry hearing to determine whether the debt owed to Aspen qualified as consumer debt. After hearing testimony from Cherrett, the bankruptcy court found that Aspen offered Cherrett the Housing Loan to entice him “to leave a secured position,” and that Cherrett purchased the Colorado property so he could “make more money” and “work at a very prestigious, top of the line” resort. The- bankruptcy court thus determined that the Housing Loan “was incurred for a business purpose” and did not constitute consumer debt. The bankruptcy court denied Aspen’s motion to dismiss. Aspen appealed to the BAP, The BAP concluded that the order denying Aspen’s motion was final and appealable, and also concluded that the bankruptcy court’s finding that Cherrett incurred the Housing Loan for a non-consumer purpose was subject to clear error review. Based on the testimony and facts presented to the bankruptcy court, the BAP ruled that there was sufficient evidence to find that Cherrett obtained the Housing Loan primarily “for a business purpose with respect to his employment with Aspen.” The BAP therefore affirmed the bankruptcy court’s order denying Aspen’s motion to dismiss under 11 U.S.C. § 707(b)(1). II. STANDARD OF REVIEW “Decisions of the BAP are reviewed de novo.” Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002). “We independently review a bankruptcy court’s ruling on appeal from the BAP,” Id, “We review the bankruptcy court’s conclusions of law de novo and its factual findings for clear error.” Id. III. DISCUSSION A. We Have Jurisdiction Over This Appeal. The bankruptcy court’s ruling must be final for this court to exercise jurisdiction under 28 U.S.C. § 158(d). Zolg v. Kelly (In re Kelly), 841 F.2d 908, 911 (9th Cir. 1988), Here, the bankruptcy court denied Aspen’s motion to dismiss, and the BAP affirmed. Ordinarily, orders denying a motion to dismiss would not constitute final, appealable orders because they do not “end[ ] the litigation on the merits and leave[] nothing for the court to do but execute the judgment.” Sahagun v. Landmark Fence Co. (In re Landmark Fence Co.), 801 F.3d 1099, 1102 (9th Cir. 2015) (quoting Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 373-74, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981)). In bankruptcy appeals, however, we have recognized “that the fluid and sometimes chaotic nature of bankruptcy proceedings necessitates a degree of jurisdictional flexibility.” Id. A bankruptcy court’s order that is affirmed or reversed by the BAP is final and appealable where the order: “1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed.” SS Farms, LLC v. Sharp (In re SK Foods, L.P.), 676 F.3d 798, 802 (9th Cir. 2012) (quoting Dye v. Brown (In re AFI Holding), 530 F.3d 832, 836 (9th Cir. 2008)). We have not expressly decided whether a bankruptcy court’s order denying a motion to dismiss under il U.S.C. § 707(b) constitutes a final, appealable order. The majority of circuits that have addressed the issue have concluded that orders on motions to dismiss for abuse of Chapter 7 are appealable. See Morse v. Rudler (In re Rudler), 576 F.3d 37, 43 (1st Cir. 2009) (collecting cases); but see Barben v. Donovan (In re Donovan), 532 F.3d 1134, 1137 (11th Cir. 2008) (holding that an order denying a motion to dismiss a Chapter 7 case under an earlier version of § 707(b) was not appealable). These circuits recognize that the current version of § 707(b), part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, “manifest[s] a congressional policy to police all Chapter 7 cases for abuse at the outset of a Chapter 7 proceeding” as well as “pragmatic considerations that indicate that the denial of a § 707(b) motion to dismiss is different from the denial of other motions to dismiss.” McDow v. Dudley, 662 F.3d 284, 288 (4th Cir. 2011). We have often concluded that other bankruptcy court orders are final and ap-pealable based on “policies of judicial efficiency and finality.” Kelly, 841 F.2d at 911; see also Meyer v. U.S. Trustee (In re Scholz), 699 F.3d 1167, 1170 (9th Cir. 2012). These policies apply in this case. As the Fourth Circuit explained: Section 707(b) creates a statutory gateway based on whether the case is abusive, and an order denying that motion to dismiss as abusive, in effect, finally and conclusively resolves the issue. If the denial of a § 707(b) motion to dismiss cannot be appealed immediately .,., the Chapter 7 proceedings would have to be completed before it could be determined whether the proceedings were abusive in the first place. McDow, 662 F.3d at 289-90. Here, the bankruptcy court’s order resolved the Cherretts’ ability to file a Chapter 7 bankruptcy petition. The order conclusively determined the discrete issue whether the Cherretts’ debt was primarily non-consumer and therefore subject to discharge under Chapter 7. We thus hold that the bankruptcy court’s order denying Aspen’s motion to dismiss under § 707(b) was final and appealable to this court.[2] B. The Bankruptcy Court Did Not Err by Finding that the Housing Loan Was a Non-Consumer Debt. 1. We Review for Clear Error the Bankruptcy Court’s Findings Regarding the Purpose of the Debt. If the bankruptcy court applied fact to law in a way that ‘“requires an inquiry that is essentially factual,’ we review it as if it were a factual finding,” but if the bankruptcy court applied fact to law in a way that “requires reference to ‘the values that animate legal principles,’ we review it as if it were a legal finding.” United States v. Hinkson, 585 F.3d 1247, 1259 (9th Cir. 2009) (quoting United States v. McConney, 728 F.2d 1195, 1202 (9th Cir. 1984) (en banc), abrogated on other grounds as recognized by Teutscher v. Woodson, 835 F.3d 936, 942 (9th Cir. 2016)). Inquiries that are essentially factual “include[ ] questions such as motive, intent, and negligence.” Id. at 1260. “[M]ixed questions of law and fact” are those “in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.” Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). “Mixed questions are typically reviewed de novo, but, depending on the nature of the inquiry involved, may be reviewed under a more deferential clearly erroneous standard.” United States v. Lang, 149 F.3d 1044, 1047 (9th Cir. 1998), amended by 157 F.3d 1161 (9th Cir. 1998) (emphasis added). Aspen argues that because the parties do not dispute the underlying facts concerning the use of the Housing Loan, de novo review applies. Aspen further argues that a debt incurred to purchase a personal residence is a consumer debt as a matter of law. Aspen cites our holding in Zolg v. Kelly (In re Kelly), 841 F.2d 908 (9th Cir. 1988), in support of its arguments. The debtors in Kelly filed a Chapter 7 bankruptcy petition with multiple mortgages against their home. Id. at 910. The bankruptcy court found that the debt was primarily consumer, but the BAP reversed on the basis that debts secured by real estate mortgages categorically do not qualify as consumer debt. Id. at 911. On appeal to this court, the debtors continued to argue that debts secured by real property can never be consumer debt. Id. at 912. We disagreed and held that consumer debt can include mortgages. Id. at 912-13. In doing so, we reviewed the BAP’s ruling de novo because the question whether mortgages could ever qualify as consumer debt was purely one of law. Id. at 911; see also id. at 911-12 (concluding that legal issues predominated where “the Kellys argue[d] that debts- secured by real property are never consumer debts, relying on floor statements made in the House and Senate prior to the enactment of the 1978 Act”). We did not hold that all debts secured by real property are consumer debt. In fact, we expressly left open the possibility that some are not: “While secured debt is not automatically excluded from consumer debt, it is not automatically included either. We must look' to the purpose of the debt in determining whether it falls within the statutory definition.” Id. at 913 (emphasis added). Kelly acknowledged that in most cases “the purchase of a home and the making of improvements thereon” will meet the statutory definition of consumer debt, but it did not fashion a bright line rule. Id. Aspen’s argument—that because most debts used to purchase homes are consumer debts, all mortgages must be consumer debts—is contrary to our case law. We have never, as Aspen and the dissent suggest, held that debts used to purchase homes are consumer debts as a matter of law, and unlike in Kelly, where there was no dispute regarding the purpose of the loan, the parties here dispute whether Cherrett incurred the Housing Loan primarily for a business purpose. Whether Cherrett’s primary purpose satisfies the. statutory requirements for a Chapter 7 bankruptcy filing is a mixed question of law and fact. Although we would typically review such a question de novo, the bankruptcy court’s weighing of Oherrett’s multiple motives for incurring the Housing Loan was primarily a factual, rather than legal, inquiry. See Ornelas v. United States, 517 U.S. 690, 702, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (“Where a trial court makes .,. commonsense determinations based on the totality of circumstances, it is ordinarily accorded deference,”). In this case, the purpose of the Housing Loan is the sort of “essentially factual” inquiry that we review for clear error, United States v. Hinkson, 585 F.3d 1247, 1259 (9th Cir. 2009),[3] but we would reach the same'result on de novo review. 2. The Bankruptcy Court Did Not Clearly Err by Finding That Cher-rett Incurred the Housing Loan Primarily for a Non-Consumer Purpose. “Consumer debt” is defined as “debt incurred by an individual primarily for a personal, family, or household purpose.” 11 U.S.C. § 101(8). We have held that “[d]ebt incurred for business ventures or other profit-seeking activities is plainly not consumer debt.” Kelly, 841 F.2d at 913. Courts determine the debtor’s purpose as of the time the debt was incurred. See Bushkin v. Singer (In re Bushkin), BAP No. CC-15-1285-KiKuF, 2016 WL 4040679, at *7 (B.A.P. 9th Cir. July 22, 2016).[4] Evidence that a debtor incurred a debt “purely or primarily as a business investment, albeit an investment in herself or himself, much like a loan incurred for a new business,” can serve as an important factor in determining the debtor’s purpose. Stewart v. U.S. Trustee (In re Stewart), 215 B.R. 456, 465 (10th Cir. BAP 1997), aff'd, 175 F.3d 796 (10th Cir. 1999) (discussing how courts should determine a debt’s purpose in the context of student loans). To determine the purpose of a home loan, it is not sufficient that a debtor hoped that the asset purchased with it would appreciate in value. See Cox v. Fokkena (In re Cox), 315 B.R. 850, 855 (8th Cir. BAP 2004) (holding that it is insufficient that debtors “subjectively hope[ ] that [a] Residence [will] appreciate in value” when “the objective evidence in the record amply supports the bankruptcy court’s finding that Debtors incurred the debts primarily for family or household purposes under § 101(8)”), Instead, it is appropriate to consider all the circumstances indicative of the debtor’s primary purpose. Westberry, 215 F.3d at 593 (“[Wjhile the profit motive analysis may assist in the determination of which debts are not consumer debt, it does not prohibit other debts from falling outside of the category of consumer debt,”); Kestell v. Kestell (In re Kestell), 99 F.3d 146, 149 (4th Cir. 1996) (determining that a debt owed pursuant to a divorce judgment was consumer debt because it was not incurred “with a profit motive or in connection with a business transaction” (emphasis added)). Here, the bankruptcy court found that Cherrett primarily had a business purpose—not a personal, family, or household purpose—for incurring the Housing Loan. Cherrett testified that he accepted Aspen’s offer and the Housing Loan so that he could “grow in salary and responsibility” and have the opportunity to oversee expansion of the Little Nell Hotel brand. The bankruptcy court fou,nd that Cherrett incurred the debt “so he could work at a very prestigious, top of the line, equal to the Four Seasons, equal to the best hotels in the world,” resort. The record leaves little doubt that the Housing Loan helped entice Cherrett to “leave a secured position.” Cherrett further testified that when he incurred the Housing Loan, his family did not intend to relocate to Colorado with him, and he considered the condominium a “place holder.” He lived alone in the condominium for two years, moving only his clothing and some personal effects from Wyoming. It is clear that the Housing. Loan did not go toward the purchase of a primary residence, or even a secondary vacation residence, for his family, Indeed, the condominium did not even accommodate his family of four. At the time Cher-rett incurred the debt, he did not intend to remain in Colorado for any substantial length of time. In fact, he hoped that he would get the chance to relocate back to Jackson Hole to spearhead the Little Nell Hotel brand development there. Cherrett purchased the Colorado condominium using the Housing Loan and relied on the annual bonus of $33,750 for interest payments.[5] The Housing Loan was a below-market-rate loan that Cherrett likely could only have obtained from his employer. The lender that originated the loan was an affiliate of Aspen, controlled by one of Aspen’s principals, and later transferred the debt to Aspen itself. Without Aspen’s assistance, Cherrett could not have afforded to buy real estate close enough to work at Aspen’s Colorado office. Cherrett also testified that renting a home was not an option based on both, availability and price. The Housing Loan was a key component of Cherrett’s compensation, made through his employer, which covered all of his annual out-of-pocket expenses related to its financing for the first ten years through bonuses and continued employment. No evidence suggests the Housing Loan would have been commercially available on the terms Cherrett received. This is not the ordinary situation where a person takes out a loan to move closer to a job for convenience or better schools, for example. This is the unusual situation where a person accepts a loan from his employer as part of a larger transaction to further his career. On these facts, the bankruptcy court did not clearly err when it found the Housing Loan and the annual bonus were part of Cherrett’s negotiated compensation package, undertaken for a business purpose connected to furthering his career, rather than a personal, family, or household expense. See Bushkin, 2016 WL 4040679, at *8 (explaining that in this case, “the home loan had a business purpose” because “it was an integral part of the business arrangement between the parties”). IV. CONCLUSION We affirm the BAP’s judgment on the order denying Aspen’s motion to dismiss. AFFIRMED. . The Cherretts do not dispute that they would be ineligible to file a Chapter 7 bankruptcy petition based on means if they incurred primarily consumer debts. . On December 3, 2014, after Aspen filed a notice of appeal in this court, the bankruptcy court issued a discharge of the Cherretts’ debts. Aspen argues that the bankruptcy court did not have jurisdiction to enter the discharge and that this court should vacate it. But Aspen did not appeal the discharge to the BAP, seek a stay of proceedings pending appeal, or amend its notice of appeal. The record does not show any exceptional circumstances for failing to appeal the issue to the BAP or a district court. Thus, whether the discharge was erroneously issued is not properly before us. See Int’l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir. 1985). . Courts are split on this standard of review. The Eighth Circuit BAP is in accord with our conclusion that the purpose of a debt is a factual finding reviewed for clear error, See Lapke v. Mut. of Omaha Bank (In re Lapke), 428 B.R. 839, 842 (8th Cir. BAP 2010). The Tenth and Fifth Circuits have reached the opposite conclusion. See Stewart v. U.S. Trustee (In re Stewart), 175 F.3d 796, 803 (10th Cir. 1999); Matter of Booth, 858 F.2d 1051, 1053 n.5 (5th Cir. 1988), But like our decision in Kelly, the Fifth Circuit's decision in Booth turned on whether an entire category of debt must always be consumer or non-consumer, a legal rather than factual question. See Booth, 858 F.2d at 1055 (“Similarly, the district court erred in its determination that a signature loan, no matter what use to which it is put, is always consumer debt,” (emphasis added)). The same is true of IRS v. Westberry (In re Westberry), 215 F.3d 589 (6th Cir. 2000) and Cypher Chiropractic Ctr. v. Runski (In re Runski), 102 F.3d 744 (4th Cir. 1996), unillu-minating cases the dissent suggests we overlook. The sole issue presented in Westherry was legal: "whether federal income and self-employment taxes should be considered consumer debt” categorically. Westberry, 215 F.3d at 590. Runski also addressed a categorical question: whether medical equipment used at the debtor’s business was nevertheless intended primarily for personal use solely because it was titled in the debtor's name. Runski, 102 F.3d at 747. . The appeal in Bushkin is currently stayed pending resolution of this case. . Correspondence confirming Cherrett's acceptance of Aspen’s job offer memorialized that Cherrett’s compensation included a "deferred compensation/cxecutive bonus plan" that was guaranteed to provide annual bonuses timed to coincide with “the date upon which annual interest on the [Housing Loan] [was] due.” This arrangement was designed "to ensure that [Cherrett had] no annual out of pocket expenses related to the financing of [the] loan” for its first ten years, Before the bankruptcy court, Aspen’s lawyers characterized this arrangement as the employer "providing] a bonus to the employee equivalent to the interest on the loan, paying] itself the interest from that bonus, and paying] the employee the taxes on that income at the assumed tax rate of 35%.”