FILED

NOV 07 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

ORDERED PUBLISHED

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-14-1056-DKiTa |
| PAUL RICHARD CHERRETT AND COLLEEN COURTNEY CHERRETT, | Bk. No. RS 13-24792-SC |
| Debtors. | |
| ASPEN SKIING COMPANY, | |
| Appellant, | |
| v. | **O P I N I O N** |
| PAUL RICHARD CHERRETT; COLLEEN COURTNEY CHERRETT; ART CISNEROS, Chapter 7 Trustee, | |
| Appellees. | |

Argued and Submitted on October 23, 2014
at Malibu, CA

Filed –November 7, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Scott C. Clarkson, Bankruptcy Judge, Presiding.

---

Appearances:     Scott H. Talkov of Reid & Hellyer appeared and argued for appellant Aspen Skiing Co.; Kathleen J. McCarthy of the Law Office of Thomas H. Casey, Inc. appeared and argued and Leslie Keith Kaufman of Kaufman & Kaufman appeared for the appellees Paul and Colleen Cherrett.

---

Before:  DUNN, KIRSCHER, and TAYLOR, Bankruptcy Judges.

DUNN, Bankruptcy Judge:

Appellant Aspen Skiing Company ("Aspen") appeals the bankruptcy court's order denying its motion to dismiss Paul and Colleen Cherretts' (the "Cherretts") chapter 7 case under § 707(b)(1) based on its finding and conclusion that the Cherretts' debts were not primarily consumer debts.[1] We AFFIRM.

## I. FACTUAL BACKGROUND

A. Pre-Bankruptcy Events

Paul Cherrett ("Paul")[2] works in the hospitality industry and has worked for a number of employers during his career. Apparently, Paul is good at what he does, and his compensation historically has been high.

Beginning in 1998, Paul's employment compensation packages have included loans to assist him in securing housing. On January 16, 1998, Paul's new employer at that time, Four Seasons Hotel - Austin, provided, through its owner, two interest-free loans totaling $150,000 to the Cherretts to assist them in purchasing a residence in Austin, Texas. The Cherretts subsequently sold their Austin residence on August 9, 2002, for a profit after repaying the senior secured loan and the "employer-sponsored" subordinate loans secured by the property.

---

[1] Unless otherwise indicated, all chapter and section references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] We refer to Mr. Cherrett by his first name for convenience. No disrespect is intended.

On August 12, 2002, Paul's new employer, Four Seasons Hotel - Jackson Hole, provided, through its owner, an interest-free loan to assist the Cherretts in acquiring a residence in Jackson, Wyoming (the "Jackson Residence"). When the Cherretts ultimately sold the Jackson Residence in 2009, they realized a profit of approximately $250,000 after paying all liens on the property, including the employer-sponsored loan.

Paul first was contacted by Aspen in December 2006 to consider an employment opportunity, but since the open position was essentially comparable to his current job, he thanked Aspen's representative but indicated that he was not interested. Approximately three months later, Paul received an e-mail from a "headhunter" about a position with Aspen of substantially greater responsibility. He expressed interest and went through the job interview process.

Apparently, Aspen liked what they heard in his interviews, and Paul entered into employment negotiations with Aspen. The initial salary proposed by Aspen, at least from Paul's perspective, did not cover the high cost of living/housing in the Aspen, Colorado area. Ultimately, Paul accepted a written offer of employment from Aspen that included a $300,000 salary, a "signing bonus" of $75,000, participation in an incentive plan for potential additional compensation annually, and the following provisions for a "housing loan" ("Housing Loan"):

> Your offer includes a housing loan of up to $500,000, which would be second to your primary mortgage. This program will include an annual bonus guaranteed to offset your tax liability for the interest on this loan, calculated at a 35% tax rate. You will receive a guaranteed annual bonus of up to $33,750 to offset the annual interest on this loan, as well as your tax

liability ($25,000 in interest, $8,750 for taxes, assuming principal of $500,000). This bonus will be paid simultaneous to the date upon which annual interest on the loan is due, to ensure you have no annual out of pocket expenses related to the financing of this loan. You will not be required to repay any additional interest on this loan, if your employment with [Aspen] continues through 2015.

In addition, Paul agreed with Aspen that if his employment with Aspen terminated (other than as a result of death or disability) or he ceased to reside at the property purchased with the Housing Loan (either alternative designated as a "Repayment Event") prior to December 31, 2015, Paul would be required to pay the following amounts in addition to repayment of the Housing Loan:

If the Repayment Event occurs in years 1-2, the reimbursement amount will be $140,000[;] If the Repayment Event occurs in years 3-4, the reimbursement amount will be $120,000; If the Repayment Event occurs in years 5-6, the reimbursement amount will be $100,000; If the Repayment Event occurs in years 7-8, the reimbursement amount will be $80,000.

An aspect of Paul's prospective employment with Aspen that particularly interested him was the potential for participating in expanding the "Little Nell Hotel" brand beyond the Aspen, Colorado area. Aspen owned one Little Nell Hotel, but there was a project already under way to build a new Little Nell Hotel in Jackson Hole, Wyoming. One of Paul's roles with Aspen was "to grow the [Little Nell] brand."

Paul went to work for Aspen in the spring of 2007. When he accepted the job, he realized that he would have to live in the Aspen, Colorado area, at least for a while.

In June 2007, the Cherretts purchased a condominium in Basalt, Colorado ("Colorado Residence") for $995,000, and Paul began living in it. The Cherretts contributed cash, borrowed

-4-

$417,000 secured by a first trust deed on the Colorado Residence, and borrowed $500,000, the Housing Loan, from Aspen secured by a second trust deed, to fund the purchase of the Colorado Residence. When he bought the Colorado Residence, Paul hoped that it would appreciate in value so that when it was sold, the Cherretts would realize a profit. Initially, at least, Paul considered the Colorado Residence to be a "place holder until we got settled." The Cherretts purchased the Colorado Residence at the "very peak of the real estate bubble."

When the Cherretts bought the Colorado Residence, Mrs. Cherrett ("Colleen")[3] continued to reside in the Jackson Residence. The Colorado Residence was a 1400 square feet, two bedroom condominium. The Jackson Residence was a 4,000 square feet, four bedroom house. The Cherretts have two children. At the time that they bought the Colorado Residence, their son was graduating from high school and would be off to college in the fall. However, their daughter had two years more in high school, and Colleen stayed with her at the Jackson Residence until she graduated from high school, by which time, the Jackson Residence was sold. Colleen did not move to the Colorado Residence until June or July 2009.

In the meantime, 2008 brought the recession, and Aspen "pulled the plug" on expanding the Little Nell Hotel brand to Jackson Hole. In addition, the value of the Colorado Residence plummeted, and the Cherretts' hopes of realizing a profit on

---

[3] Again, we refer to Mrs. Cherrett by her first name for convenience. No disrespect is intended.

resale evaporated. Paul remained with Aspen until 2011, when he resigned from Aspen to go to work for Talisker Mountain Company ("Talisker") in Park City, Utah, at a higher level of compensation. He worked for Talisker for a year and then attempted to start his own business. In April 2013, he accepted employment with a Hilton company and moved to California.

B. The Cherretts' Bankruptcy Proceedings

The Cherretts filed their chapter 7 petition in the bankruptcy court for the Central District of California on August 30, 2013. In their petition, the Cherretts stated that their debts were primarily "consumer debts," as defined in § 101(8). The only real property listed on their Schedule A was the Colorado Residence, and on their Schedule D, the Cherretts valued the Colorado Residence at $420,000 and listed two undisputed debts: a $417,000 fully secured first mortgage debt to Everhome Mortgage, and a $550,000 debt to Aspen, of which $547,000 was listed as unsecured. The only other debts included in the Cherretts' schedules were two unsecured debts on Schedule F: a $25,444 student loan debt to Sallie Mae, and a $4,200 debt for homeowners association dues. In their schedules, the Cherretts indicated that they intended to surrender the Colorado Residence.

On November 27, 2013, Aspen filed a motion to dismiss ("Motion to Dismiss") the Cherretts' chapter 7 case as an abuse under § 707(b)(1) and Rule 1017, arguing that the Cherretts had sufficient projected disposable income to pay all or substantially all of their creditors in full through a chapter 13 plan. Aspen relied on the Cherretts' admission in their petition that their debts were primarily consumer debts but also cited the

Ninth Circuit's decision in <u>Zolg v. Kelly (In re Kelly)</u>, 841 F.2d 908, 913 (9th Cir. 1988), for the proposition that, "[i]t is difficult to conceive of any expenditure that serves a 'family . . . or household purpose' more directly than does the purchase of a home."

On December 4, 2013, the Cherretts amended their bankruptcy petition to state that their debts were primarily business debts. On the same day, the Cherretts filed their opposition to the Motion to Dismiss, arguing that their debts (focusing on the Housing Loan debt) were primarily "Non-Consumer" debts. Consequently, § 707(b)(1) did not apply, and their chapter 7 case was not an "abuse." They argued that if second mortgage debt, such as the Housing Loan, was incurred for a business purpose or with a profit motive, it was not "consumer debt."

Aspen filed a reply on December 11, 2013, challenging the Cherretts' credibility and reiterating its position, based on <u>In re Kelly</u>, that debts incurred for the purchase of a personal residence are consumer debts.

The bankruptcy court scheduled an evidentiary hearing ("Hearing") for January 22, 2014 on the Motion to Dismiss, limited to the issue of "whether the debt owed to [Aspen] is a consumer debt or non-consumer debt." The parties subsequently exchanged discovery; Aspen's counsel took the deposition of Paul; and the parties filed trial briefs and evidentiary submissions.

At the Hearing, Paul testified and was examined at length by counsel for both Aspen and the Cherretts. The bankruptcy court then heard argument and engaged in extensive colloquy with counsel. At the conclusion of the Hearing, the bankruptcy court

announced its findings and conclusions orally. Specifically, the bankruptcy court found that Paul's purposes in securing the Housing Loan were primarily employment and business purposes. Accordingly, the bankruptcy court determined that the Housing Loan was not consumer debt and denied the Motion to Dismiss.

On February 3, 2014, the bankruptcy court entered an order ("Order") denying the Motion to Dismiss for the reasons stated on the record at the Hearing. Aspen filed a timely Notice of Appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). However, before we can review this appeal, we must consider our own jurisdiction to hear it.

We have jurisdiction to hear bankruptcy appeals from final orders, judgments and decrees. See 28 U.S.C. § 158. Given the unique nature of bankruptcy proceedings, we apply a pragmatic approach to determine the finality of orders. Congrejo Invs., LLC v. Mann (In re Bender), 586 F.3d 1159, 1163 (9th Cir. 2009). A bankruptcy court order is final and thus appealable "'where it 1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed.'" SS Farms, LLC v. Sharp (In re SK Foods, L.P.), 676 F.3d 798, 802 (9th Cir. 2012)(quoting Dye v. Brown (In re AFI Holding, Inc.), 530 F.3d 832, 836 (9th Cir. 2008)).

Generally, an order denying a motion to dismiss is interlocutory. Hickman v. Hana (In re Hickman), 384 B.R. 832, 836 (9th Cir. BAP 2008)(citing Sherman v. SEC (In re Sherman), 491 F.3d 948, 967 n.24 (9th Cir. 2007)(reviewing § 707(a) motion

-8-

to dismiss); and <u>Dunkley v. Rega Props., Ltd. (In re Rega Props., Ltd.)</u>, 894 F.2d 1136, 1137-39 (9th Cir. 1990)(reviewing § 1112(b) motion to dismiss)).  But the new provisions added to § 707(b) under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005)("BAPCPA"), "manifest a congressional policy to police all Chapter 7 cases for abuse at the outset of a Chapter 7 proceeding, and . . . raise pragmatic considerations that indicate that the denial of a § 707(b) motion to dismiss is different from the denial of other motions to dismiss [e.g., Civil Rule 12(b) or § 1112(b)(1)-(4) motions]." <u>McDow v. Dudley</u>, 662 F.3d 284, 288 (4th Cir. 2011).  "Section 707(b) creates a statutory gateway based on whether the case is abusive, and an order denying that motion to dismiss as abusive, in effect, finally and conclusively resolves the issue.  If the denial of a § 707(b) motion to dismiss cannot be appealed immediately to the district court, the Chapter 7 proceedings would have to be completed before it could be determined whether the proceedings were abusive in the first place." <u>Id.</u> at 289-90 (citation omitted).

The Ninth Circuit has not yet specifically addressed the finality of orders denying motions to dismiss chapter 7 cases for abuse under § 707(b) after BAPCPA.  However, the First, Third, Fourth, Fifth, Seventh and Eighth Circuits consider such orders to be final based on practicality, judicial efficiency and other pragmatic considerations.  See <u>Morse v. Rudler (In re Rudler)</u>, 576 F.3d 37, 43-44 (1st Cir. 2009)(holding that an order denying a motion to dismiss under § 707(b), "where the dispute at issue turns on a question of law," is final because delaying

consideration of the legal question in such an order "may frustrate both principles of judicial economy and Congress's goal of ensuring that debtors allocate as much of their resources as possible toward repaying their debts. . . . [M]otions to dismiss for abuse under section 707(b) are subject to statutory deadlines, presumably foreclosing renewed requests for dismissal as the Chapter 7 case proceeds."); In re Christian, 804 F.2d 46, 48 (3d Cir. 1986)(determining it had jurisdiction to review an order denying a motion to dismiss a chapter 7 case under § 707(b), based on judicial efficiency and practicality, for, if such an order was "not now appealable the entire bankruptcy proceedings must be completed before it can be determined whether they were proper in the first place"); McDow v. Dudley, 662 F.3d at 290 (holding that "pragmatic considerations of preserving resources for creditors in bankruptcy and promoting judicial economy weigh heavily in favor of recognizing the finality of an order denying a § 707(b) motion to dismiss"); U.S. Trustee v. Cortez (In re Cortez), 457 F.3d 448, 453-54 (5th Cir. 2006)(determining that a district court's order remanding a bankruptcy court's order denying the trustee's motion to dismiss under § 707(b) is a final order because the remand order left only ministerial tasks for the bankruptcy court); Ross-Tousey v. Neary (In re Ross-Tousey), 549 F.3d 1148, 1152-54 (7th Cir. 2008)(determining that the district court's remand order and the bankruptcy court's order denying the U.S. Trustee's motion to dismiss under § 707(b)(2) and (b)(3)(B) were final), abrogated on other grounds by Ransom v. FIA Card Servs., N.A., 562 U.S. 61 (2011); Stuart v. Koch (In re Koch), 109 F.3d 1285, 1288 (8th

-10-

Cir. 1997):

> If [orders denying dismissal for substantial abuse] cannot be appealed, bankruptcy proceedings must 'be completed before it can be determined whether they were proper in the first place.' In re Christian, 804 F.2d [46,] 48 [(3rd Cir. 1986)]. Requiring trustees to complete Chapter 7 proceedings before appealing denial of their § 707(b) motions wastes debtor resources that should be used to pay creditors, and forces trustees and bankruptcy courts to expend their scarce institutional resources on abusive Chapter 7 petitioners. Thus 'the policies of judicial efficiency and finality are best served' by allowing prompt appellate review of § 707(b) denials. Zolg v. Kelly (In re Kelly), 841 F.2d at 911.

We agree with the reasoning of the circuits that have addressed the issue regarding the finality of orders denying § 707(b) motions to dismiss. If such an order is not considered final, the moving party and the debtor will have to wait until the case is completed, which "wastes debtor resources that should be used to pay creditors, and forces trustees and bankruptcy courts to expend their scarce institutional resources on abusive Chapter 7 petitioners." McDow, 662 F.3d at 290 (quoting Koch, 109 F.3d at 1288)(internal quotation marks omitted). Moreover, postponing the appeal until the end of the bankruptcy case could result in the need to unwind various administrative actions, likely with some difficulty (e.g., having to revoke the debtor's discharge, potentially compelling creditors to disgorge distributions made by the trustee).

Alternatively, even if the Order is interlocutory, we have jurisdiction to review it because we earlier granted leave to appeal to the extent necessary under 28 U.S.C. § 158(a)(3) based

on the pragmatic considerations discussed above.[4]

## III. ISSUE

When denying the Motion to Dismiss for abuse under § 707(b)(1), did the bankruptcy court err in finding that the Housing Loan was non-consumer debt?

## IV. STANDARDS OF REVIEW

We review de novo issues of statutory construction and conclusions of law, including a bankruptcy court's interpretation of the Bankruptcy Code. Samson v. W. Capital Partners, LLC (In re Blixseth), 684 F.3d 865, 869 (9th Cir. 2012)(per curiam).

We review a bankruptcy court's findings of fact for clear error. Decker v. Tramiel (In re JTS Corp.), 617 F.3d 1102, 1109 (9th Cir. 2010)(quoting Leichty v. Neary (In re Strand), 375 F.3d 854, 857 (9th Cir. 2004)). "We will affirm a [bankruptcy court's] factual finding unless that finding is illogical, implausible, or without support in inferences that may be drawn from the record." U.S. v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). See also Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985)("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). We must accept a bankruptcy

---

[4] Aspen filed its opening brief on March 24, 2014. In its opening brief, Aspen argued that the Order was final. Alternatively, Aspen sought leave to appeal.

On March 26, 2014, a clerk's order was issued ("Clerk's Order Re: Finality"), asking the Cherretts to respond to the question of whether the Order was final. After reviewing the Cherretts' and Aspen's responses to the Clerk's Order Re: Finality, an order was issued on May 12, 2014, granting leave to appeal to the extent necessary under 28 U.S.C. § 158(a)(3).

-12-

court's findings of fact unless we have a definite and firm conviction that a mistake has been committed. <u>In re JTS Corp.</u>, 617 F.3d at 1109.

We review de novo mixed questions of law and fact. <u>Id.</u>

**V. DISCUSSION**

Under § 707(b)(1), after notice and a hearing on a motion by a party in interest, the bankruptcy court may dismiss a chapter 7 case when an individual debtor has primarily consumer debts and if the bankruptcy court finds that granting relief would be an abuse of the provisions of chapter 7.[5] Restated, there are two prerequisites to dismissal under § 707(b)(1): 1) the debtor has primarily consumer debt; and 2) the bankruptcy court finds that granting the debtor's petition would be an abuse of chapter 7. <u>Price v. U.S. Trustee (In re Price)</u>, 353 F.3d 1135, 1138 (9th Cir. 2004). The moving party bears the burden of proof to support a § 707(b)(1) motion by a preponderance of the evidence. <u>In re Baker</u>, 400 B.R. 594, 597 (Bankr. N.D. Ohio 2009).

Only the first § 707(b)(1) prerequisite is at issue in this appeal. The bankruptcy court denied the Motion to Dismiss

---

[5] Section 707(b)(1) provides, in relevant part:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. . . .

-13-

because it found that the Cherretts did not have primarily consumer debt, as the Housing Loan, which formed the bulk of their debt, was non-consumer debt. Aspen challenges this fact finding on two grounds: 1) the Housing Loan is consumer debt as a matter of law under § 101(8), as interpreted by Zolg v. Kelly (In re Kelly), 841 F.2d 908 (9th Cir. 1988)("Kelly"); and 2) the fact that the Housing Loan was employer-sponsored is irrelevant because the determination of whether the Housing Loan qualifies as consumer debt turns on Paul's purpose. If Paul's purpose for incurring the Housing Loan was primarily for personal, family or household use, then the Housing Loan would qualify as consumer debt. Aspen contends that Paul obtained the Housing Loan specifically to purchase the Colorado Residence as his personal residence. The Housing Loan thus qualifies as consumer debt.[6]

Given Aspen's contentions, this appeal turns on whether we agree with the bankruptcy court's characterization of the Housing Loan as non-consumer debt. We therefore begin our analysis by examining the definition of "consumer debt" under § 101(8).

Section 101(8) defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." Consumer debt includes both unsecured and secured

---

[6] In its motion to dismiss, Aspen claimed that the Cherretts had sufficient disposable income to pay their unsecured creditors through a chapter 13 plan. However, the Cherretts' schedules, which were signed under penalty of perjury and were the sole evidence before the bankruptcy court on this point, indicated that their unsecured debt exceeded the statutory maximum under § 109(e). The Cherretts therefore were potentially ineligible for relief under chapter 13, as noted by the bankruptcy court at the Hearing.

-14-

debt. <u>Kelly</u>, 841 F.2d at 912. Whether a particular secured debt is or is not characterized as consumer debt under § 707(b) depends on the purpose of the debt. <u>Price</u>, 353 F.3d at 1139; <u>Kelly</u>, 841 F.2d at 913. <u>See also</u> <u>Stine v. Flynn (In re Stine)</u>, 254 B.R. 244, 249 (9th Cir. BAP 2000)("It is the <u>purpose for which the debt was incurred</u> that determines whether it is a consumer debt.")(citing <u>Kelly</u>, 841 F.2d at 913)(emphasis added)); <u>Cypher Chiropractic Ctr. v. Runski (In re Runski)</u>, 102 F.3d 744, 747 (4th Cir. 1996)("[C]ourts have concluded uniformly that debt incurred for a business venture or with a profit motive does not fall into the category of debt incurred for 'personal, family, or household purposes.'")(citations omitted); and <u>A.L. Lee Mem'l Hosp. v. McFadyen (In re McFadyen)</u>, 192 B.R. 328, 333 (Bankr. N.D.N.Y. 1995)("The courts generally ascribe a <u>business</u> purpose, rather than a personal, family or household purpose to debts which are incurred 'with an eye toward profit' and which are 'motivated for ongoing business requirements.'")(citations omitted)(emphasis in original).[7]

Aspen insists that <u>Kelly</u> definitively classified all mortgage debt as consumer debt. It points out that this holding in <u>Kelly</u> was reinforced in <u>Price v. U.S. Trustee (In re Price)</u>, 353 F.3d 1135, 1139 (9th Cir. 2004). The <u>Kelly</u> holding therefore

---

[7] In a home loan context, an expectation of profit alone, in our view, does not satisfy the <u>Kelly</u> standard for a non-consumer debt. It is a truism that every red-blooded American who buys a home expects a profit when it is sold. If that expectation were enough to take home loan debt outside of the consumer debt category, the exception would swallow the <u>Kelly</u> rule.

is the rule of law in the Ninth Circuit.

In <u>Kelly</u>, the debtors filed a petition under chapter 7. They scheduled $181,350 in assets, $147,000 in debt secured by mortgages against their home and $25,000 in unsecured debt owed to certain defendants in a state court action which the debtors lost. <u>Kelly</u>, 841 F.2d at 910. The bankruptcy court sua sponte found that the debtors owed primarily consumer debts and that granting them chapter 7 relief would be a substantial abuse because they could easily pay all of their debts. It accordingly dismissed the debtors' chapter 7 case. After moving for reconsideration with the bankruptcy court, which was denied, the debtors appealed to the BAP, which reversed the bankruptcy court on the ground that the debtors did not have primarily consumer debts because most of their debts were secured by real estate mortgages. <u>Kelly v. Solot (In re Kelly)</u>, 70 B.R. 109, 111-12 (9th Cir. BAP 1986).

On appeal, the debtors argued that debts secured by real property were <u>never</u> consumer debts. Because 85% of their debts was secured by their home, the debtors maintained that they could not have primarily consumer debts. Dismissal under § 707(b) was inappropriate.

The Ninth Circuit disagreed with this contention because a literal reading of § 101(8) and related statutes (i.e., § 101(12) and (5)(A)) "inexorably [led] to the conclusion that consumer debt includes secured debt."[8] <u>Kelly</u>, 841 F.2d at 912. It went on

---

[8] The Ninth Circuit issued <u>Kelly</u> years before BAPCPA. <u>Kelly</u> cited § 101(7), 101(4)(A) and (11), which, at the time, set forth the definition of "consumer debt," "claim" and "debt,"

(continued...)

-16-

to note that secured debt neither was excluded from nor included in consumer debt <u>automatically</u>. <u>Id.</u> at 913. The Ninth Circuit concluded that it "must look to the purpose of the debt in determining whether it falls within the statutory definition." <u>Id.</u>

Upon review of the debtors' mortgage debts, the Ninth Circuit determined that $95,000 consisted of a lien the debtors assumed in purchasing their home and $32,000 represented a home equity line of credit incurred for home improvements and the repayment of credit card debts. <u>Id.</u> It concluded that all of those debts "fit comfortably within the [Bankruptcy] Code's definition of consumer debt." <u>Id.</u>

We acknowledge that on its facts, <u>Kelly</u> characterized mortgage debt as consumer debt. But Aspen overlooks one of the main points of <u>Kelly</u>: <u>Kelly</u> held that, "[w]hile secured debt is not automatically excluded from consumer debt, it is <u>not</u> <u>automatically included</u> either. We must look to the <u>purpose of</u> <u>the debt</u> in determining whether it falls within the statutory definition." <u>Id.</u> (Emphasis added.) Notably, though Aspen urges us to apply <u>Kelly</u> to the circumstances here without further analysis, it also zeroes in on Paul's purpose in obtaining the Housing Loan as an alternative basis for reversing the bankruptcy court.

Aspen contends that the Cherretts base their

---

[8](...continued) respectively. Section 101(8), (5)(A) and (12) currently set forth these definitions. Although the numbering of these definitions under § 101 has changed, the definitions themselves have not since the Ninth Circuit decided <u>Kelly</u>.

characterization of the Housing Loan as non-consumer debt on Aspen's purpose in providing the Housing Loan. According to Aspen, the Cherretts argue that the purpose of the Housing Loan was to augment Paul's compensation. In making such an argument, the Cherretts focus on the lender's motive. But, Aspen asserts, the debtor's purpose, not the lender's purpose, is the controlling determinant under § 101(8). Section 101(8) specifically states that consumer debt is debt incurred by an individual debtor for a personal, family or household purpose. The lender's motive thus is irrelevant to determining whether a secured debt qualifies as a consumer debt. Moreover, Aspen contends, if the lender's motive was the determining factor, every mortgage loan would be non-consumer debt because every lender has a profit motive when it extends a mortgage loan.

Aspen further argues that the Cherretts did not incur the Housing Loan for a business purpose. The Housing Loan did not become a non-consumer debt simply because it was part of Paul's compensation. Also, Aspen claims, the Housing Loan was not a condition for his employment.

At the Hearing, the bankruptcy court found that "[Paul's] purpose of securing that debt, or incurring that debt, was for employment purposes. The man needed to make money. He wanted to take the job. He knew he – to leave a [secure] position, he wanted to make more money." Tr. of Jan. 22, 2014 hr'g, 103:15-19. It concluded that Paul incurred the Housing Loan for a business purpose; he "did it so he could work at a very prestigious, top of the line, equal to the Four Seasons, equal to the best hotels in the world [employer] . . . ." Tr. of Jan. 22,

-18-

2014 hr'g, 104:5-7. The bankruptcy court therefore ruled that "primarily this loan was incurred for a business purpose." Tr. of Jan. 22, 2014 hr'g, 103:20. Based on the record before us, we perceive no error in the bankruptcy court's conclusion that Paul's primary purpose in obtaining the Housing Loan was for business (i.e., employment).

As Aspen recognizes, the key factor in determining whether secured debt is consumer debt lies in the debtor's purpose in incurring the secured debt. Where the debt was incurred for more than one purpose, the primary purpose of the debt will determine its nature. See, e.g., Price, 353 F.3d at 1139; Swartz v. Strausbaugh (In re Strausbaugh), 376 B.R. 631, 639 (Bankr. S.D. Ohio 2007)(quoting 2 Collier on Bankruptcy ¶ 101.08, at 101-47 (Lawrence P. King ed., 15th ed. rev. 2004)("If a debt is incurred partly for business purposes and partly for personal, family or household purposes, the term 'primarily' in the definition suggests that whether the debt is a 'consumer debt' should depend upon which purpose predominates. Presumably, this determination would normally turn on the purpose for which most of the funds were obtained.")). Based on the record before us, the bankruptcy court did not err in finding that Paul's primary purpose in obtaining the Housing Loan was employment related.

Paul repeatedly asserted that he obtained the Housing Loan to purchase the Colorado Residence, not only in hopes of realizing a profit on resale, but also because it was an integral part of his entering into employment with Aspen. He testified at the Hearing that he believed the Housing Loan "was both compensation and [he] certainly expected to profit from

-19-

appreciation." Tr. of Jan. 22, 2014 hr'g, 15:16-18.

When he decided to accept employment with Aspen, Paul "look[ed] at everything in totality[.]" Tr. of Jan. 22, 2014 hr'g, 53:13. He considered the salary offered by Aspen, along with the Housing Loan; together, the salary and the potential for appreciation in the Colorado Residence "[were] considerably more than [he] was making" with his previous employer. Tr. of Jan. 22, 2014 hr'g, 53:14.

In his declaration attached to the Cherretts' opposition to the Motion to Dismiss, Paul asserted that accepting the position with Aspen required that he move from Jackson, Wyoming to Aspen, Colorado. Because real estate was expensive in Aspen, Colorado, and his income with Aspen would not allow him to buy real estate there, Aspen offered to help Paul in the purchase of housing. Specifically, he stated that "in lieu of a higher salary, extended in the offer of employment, [Aspen offered] an interest-free loan tied to [his] employment and to be secured by a trust deed against the [real estate] he was to purchase." Paul further asserted that, "given the initial salary offered, and in lieu of a higher salary, and specifically to compensate for the higher cost of housing in [Aspen, Colorado], Aspen offered to pay the difference between the purchase price and the amount [he and Colleen] could afford to pay."

At his December 6, 2013 deposition, Paul explained that, when discussing the terms of Aspen's employment offer, he expressed concern over the cost of living in Aspen, Colorado. He therefore asked Aspen, "[W]hat other ways could [he] be compensated, for instance, to allow [him] to live in the area[?]"

-20-

Tr. of Dec. 6, 2013 deposition, 10:14-16.  Paul explained that he had received benefits from his prior employer in Jackson, Wyoming, that he was not receiving from Aspen.  He then went on to state that Aspen "offered the [Housing Loan] and the potential for appreciation in balance and bonus plan.  So, you know, [he] was looking for a greater net return in time, and one of those – part of that was appreciation of the home."  Tr. of Dec. 6, 2013 deposition, 37:22-25, 38:1.

At the Hearing, Paul testified that the Housing Loan was made part of the negotiations for his employment with Aspen.  He stated that he "assume[d] it was because [he] had to weigh the total compensation package, and it either [came] in the form of a salary or other things that convey[ed] with that."  Tr. of Jan. 22, 2014 hr'g, 6:3-5.  He emphasized later at the Hearing that "the solution to let's say the income that [he] needed to accept the position in Aspen [Colorado] and live in Aspen [Colorado] required that [Aspen] come up with a compensation package that included salary and something else.  So, that's where the [H]ousing [L]oan came in in the form of a bonus."  Tr. of Jan. 22, 2014 hr'g, 9:12-16.  Paul testified that the Housing Loan was offered instead of a higher salary.  He also testified that Aspen even had characterized the Housing Loan as "a deferred compensation bonus plan."  Tr. of Jan. 22, 2014 hr'g, 40:21-22.

The written offer presented by Aspen supports Paul's view of the Housing Loan as part of his employment with Aspen.  The written offer provided that it "include[d] a housing loan of up to $500,000."  It further provided him an annual bonus to offset annual interest on the Housing Loan and his tax liability for the

-21-

interest on the Housing Loan.

Paul further explained that he felt he had no choice but to purchase the Colorado Residence based on his compensation from Aspen. He testified that if he "wanted that compensation plan and [he] wanted that interest free loan, [he] needed to buy a home with that money." Tr. of Jan. 22, 2014 hr'g, 11:18-20. He believed that "[Aspen] said if [he] want[ed] to work here [in Aspen, Colorado], here's [his] compensation plan. This is what [he could] do with the money. So, [he] had to buy a home with it. There was no other way [the offer] was written." Tr. of Jan. 22, 2014 hr'g, 11:22-24. Paul explained that it "made more economic sense to [Aspen] to give [him] a housing loan and pay [him] a certain wage," given the high cost of rent and the amount of compensation offered by Aspen. Tr. of Jan. 22, 2014 hr'g, 38:25, 39:1-2. He thus purchased the Colorado Residence "because it just seemed like it was the most cost effective and . . . a financially advantageous route to take." Tr. of Jan. 22, 2014 hr'g, 39:2-4.

At his deposition, Paul stressed that the "only thing [he] could have benefitted from was the appreciation of the [Colorado Residence]." Tr. of Dec. 6, 2013 deposition, 39:5-6. "[T]he benefit to [him] would have been at the end when the [Colorado Residence] was sold that [he] had some type of appreciation." Tr. of Dec. 6, 2013 deposition, 39:8-10. He further explained that he had a profit motive in purchasing the Colorado Residence because "at the time housing prices were skyrocketing, and so the opportunity there was to benefit from that increasing market." Tr. of Dec. 6, 2013 deposition, 91:19-21.

-22-

Paul provided ample evidence that he obtained the Housing Loan for a business purpose with respect to his employment with Aspen. Given his testimony at the Hearing, his deposition and his declaration, as well as the written offer of employment from Aspen, the bankruptcy court had sufficient evidence to find that Paul's purpose in obtaining the Housing Loan was primarily related to his employment. We discern no clear error by the bankruptcy court in making that determination.

**VI.   CONCLUSION**

To dismiss a chapter 7 case for abuse under § 707(b)(1), the bankruptcy court must find that: 1) the debtor had primarily consumer debt and 2) granting his petition would be an abuse of chapter 7. Only the first prerequisite is at issue on appeal. Here, the Cherretts provided ample evidence through Paul's testimony at the Hearing, at his deposition and in his declaration, that their purpose in obtaining the Housing Loan was primarily business/employment-oriented. Based on the evidence before it, the bankruptcy court did not clearly err in finding that the Housing Loan was not consumer debt within the meaning of § 101(8). The bankruptcy court properly denied the Motion to Dismiss when it determined that the first prerequisite of § 707(b)(1) was not met. We AFFIRM.