**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   CC-15-1285-KiKuF |
| ) | |
| HENRY ISAAC BUSHKIN, ) | Bk. No.   2:11-bk-43502-DS |
| ) | |
| Debtor. ) | Adv. No.   2:13-ap-02172-DS |
| _____ ) | |
| ) | |
| HENRY ISAAC BUSHKIN, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **M E M O R A N D U M**[1] |
| ) | |
| BRUCE SINGER; SINGER ) | |
| FINANCIAL CORPORATION, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on June 23, 2016,
at Pasadena, California

Filed - July 22, 2016

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Deborah J. Saltzman, Bankruptcy Judge, Presiding

Appearances:    Anthony J. Rothman argued for appellant Henry Isaac Bushkin; David I. Brownstein argued for appellees Bruce Singer and Singer Financial Corporation.

Before:   KIRSCHER, KURTZ and FARIS, Bankruptcy Judges.

_____

[1]  This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, it has no precedential value. See 9th Cir. BAP Rule 8024-1.

Appellant, chapter 7[2] debtor Henry Isaac Bushkin ("Debtor"), appeals an order denying his motion for attorney's fees and costs under § 523(d). The bankruptcy court determined that the debt to Bruce Singer and his wholly-owned entity Singer Financial Corporation ("SFC") (collectively, the "Singer Parties") was not a consumer debt and, alternatively, that the Singer Parties' claims under § 523(a)(2) were substantially justified. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Prepetition events

Debtor is an attorney licensed in California and New York. In or about 2008, he began writing a book about his relationship with entertainer Johnny Carson, who was his client and friend. At this point in time, Debtor contends he was suffering financially due to the economic downturn. In 2008, before the book was completed, Debtor began marketing it to various publishers, film studios and agents. Some parties expressed great interest in the book and represented to Debtor that it had value.

To finish the book, Debtor approached Singer, a long-time friend, for money. Singer agreed to advance Debtor money — through SFC — in exchange for a share of the proceeds from the book Debtor was writing. On January 29, 2009, Debtor, Singer and SFC entered into an agreement (the "Agreement"), which provided that SFC would make advances to Debtor, who would "devote full time to the completion" of the manuscript. From the advanced funds, Debtor could receive living expenses for the months of

---

[2] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

February and March 2009, not to exceed $25,000 per month. Singer was responsible for exploiting the book and film rights, but Singer and Debtor would have to mutually agree to the sale of any such rights.

If the manuscript sold, proceeds from the sale would be divided as follows: 10% would go to an agent; the entire amount of the advance would be repaid to SFC or Singer; and Singer and Debtor would split the remaining balance 25/75, respectively. The Agreement noted that the parties had agreed "to create a legal entity to own and control the book and film rights to a book written by Bushkin currently entitled 'The Carson Years,'" and that the "ownership of the entity to be created [would] be divided on an equal basis between Bushkin and Singer." If the manuscript did not sell within six months, Debtor agreed to execute a note to SFC for the entire amount paid to him or advanced on his behalf.

The manuscript did not sell within the agreed six months. On September 1, 2009, Debtor executed a 36-month promissory note, agreeing to pay SFC $159,388.46, the amount advanced to Debtor, at an annual interest rate of 12%. Debtor defaulted on the note. Singer sent Debtor a notice of default, informing him that he was accelerating the note and would send it to collections if Debtor did not pay by November 15, 2009. Debtor did not pay.

**B. Postpetition events**

**1. Debtor's bankruptcy filing, Singer Parties' complaint and Debtor's pretrial motions**

In his chapter 7 bankruptcy case filed on August 5, 2011, Debtor listed Singer as an unsecured creditor with a claim of $350,000, but did not identify SFC as a creditor. Debtor

-3-

identified and valued "six chapters of material for a book" at $0.00. Singer's residence in California was listed on the creditors' mailing matrix, but the zip code listed was incorrect.

On August 10, 2011, the Bankruptcy Noticing Center ("BNC") sent the notice of the chapter 7 filing and deadlines to object to Debtor's discharge to all creditors on the mailing matrix. BNC apparently caught the zip code error for Singer and corrected it before mailing out the notice. The deadline for creditors to challenge the dischargeability of debts was November 21, 2011. No one filed any complaint for nondischargeability by the deadline. On June 20, 2012, Debtor received a discharge. BNC mailed the notice of discharge to creditors on June 22, 2012. Singer claimed he did not receive either of the notices and had no knowledge of Debtor's bankruptcy, despite their frequent contact before and after the filing and the discharge.

Meanwhile, Debtor continued writing and eventually published two books. One book, "Johnny Carson," achieved great success and was on the New York Times Best Seller list for several months. Debtor did not share any of the book proceeds with Singer or SFC and disputed that they owned any share of the book or film rights.

After Singer learned from a friend about Debtor's bankruptcy and discharge in October 2013, the Singer Parties filed an adversary complaint against Debtor on December 17, 2013. In their second amended complaint, the Singer Parties alleged claims under § 523(a)(2)(A), (a)(3)(B) and (a)(4), § 727(d)(2) and claims for declaratory relief and an accounting. Debtor moved to dismiss. He asserted that not only was Singer presumed to have received the mailed notices (which also provided notice to SFC because Singer

-4-

was SFC's registered agent for service of process at that same address), he had also actual notice. Because Debtor had met with Singer for breakfast to discuss the bankruptcy just days before it was filed, the Singer Parties had both presumed and actual knowledge of the bankruptcy so they could have filed a timely nondischargeability complaint.

The bankruptcy court dismissed the §§ 523(a)(4) and 727(d)(2) claims, but did not dismiss the § 523(a)(3)(B) claim because the Singer Parties' knowledge of the bankruptcy filing was a disputed factual issue. That left four claims: § 523(a)(2)(A), (a)(3)(B), declaratory relief and accounting.

Debtor then moved for summary judgment, contending that the remaining claims were time-barred because the Singer Parties failed to file their dischargeability complaint by the deadline and they had not provided clear and convincing evidence to rebut the presumption of receipt of the bankruptcy notice. Debtor alternatively argued that the Singer Parties' claims had been discharged; this debt arose from a breached loan/contract.

The bankruptcy court denied summary judgment, ruling that disputed issues of fact remained as to whether the Singer Parties had actual notice of the bankruptcy.

In opposition to the summary judgment motion, Singer had described his mail practices, stating that he had followed the same practice for the collection of mail at his home for more than seven years. His mailbox was located at the street in front of his residence. If he was home, he collected the mail daily at 3:00 p.m., took it to his kitchen and reviewed it. If he was out of town, his housekeeper placed the mail in a basket in Singer's

kitchen for him to review when he returned. Singer recounted that he was home on August 10, 2011, but was out of town between August 11 and August 16, 2011. He stated he received no notices from the court on August 10 and no notices from the court were in his mail basket when he returned on August 16. He admitted that he was home on June 20, 2012, but stated that he had not received any notice of Debtor's discharge on that date or anytime thereafter.

Singer also stated that his wife is the sister of actress Sharon Stone, and both she and Ms. Stone have been the victims of stalkers. Such victimization included the periodic stealing of mail from Singer's mailbox. In addition, Singer's neighbor Dr. Jentsch, a UCLA neuroscientist unpopular with animal rights groups, had been the victim of a car bombing in his driveway, and persons thinking that Singer's mailbox was Jentsch's were caught on camera in 2010 taking Singer's mail. Singer knew of the mail theft because he had hired a private investigator, Paul Barresi, to look into the matter. He attached a copy of a 2010 article regarding the mail theft. Singer stated that despite reporting the mail theft to the Los Angeles Police Department, the problem had not been remedied and was still occurring with new stalkers of Ms. Singer, Ms. Stone and Dr. Jentsch.

In support of his claims for declaratory relief and accounting, Singer had presented evidence of emails from Debtor dated before and after the parties entered into the Agreement, wherein Debtor referred to the men as "partners," discussed the status of the book and stated that "everything would be split 50/50" and that Singer would "always own half of the book." The

-6-

Singer Parties argued that these communications and conduct evidenced both an oral and written partnership agreement in which Singer acquired book and film rights to the Johnny Carson book.

**2. The trial and the bankruptcy court's ruling on the Singer Parties' claims**

Trial proceeded on the remaining four claims. By way of declaration, Debtor testified that when he spoke to Singer about writing the book, Singer thought it was a good idea and agreed to have SFC lend money to Debtor for his personal expenses while he wrote it. In return, Debtor agreed that he and Singer would be partners in the book Debtor was writing, if it were published within the agreed six months. Debtor testified that a partnership or other entity was to be formed only if the book sold within the six-month time frame. After the six months ran, Debtor said the funds advanced became a high interest loan.

The bankruptcy court decided to first hear live testimony on the question of whether the Singer Parties received notice of Debtor's bankruptcy filing, because if so, the § 523(a) claims necessarily failed. On cross-examination, Singer denied ever meeting Debtor for breakfast in California on August 14, 2011, to discuss the bankruptcy filing. Singer testified that he was in Montana between August 11 and 16, 2011, and had plane tickets and receipts to prove it. Singer's testimony at trial regarding his mail practices was consistent with what he stated in opposition to Debtor's earlier motion for summary judgment.

Following Singer's testimony and the parties' arguments regarding notice, the bankruptcy court announced its finding that Singer and SFC had received notice and awarded judgment on the

-7-

§ 523 claims to Debtor. For Singer, the court found that while his additional evidence of stalkers and mail theft rebutted the presumption of receipt of the bankruptcy notices, it did not rise to the level of clear and convincing evidence sufficient to overcome the presumption. Because notice was proper for Singer, notice was also proper for SFC; Singer was SFC's only officer and its agent for service of process, and SFC's service address was Singer's residence. As a result, the court found that the § 523(a)(2) claims were untimely.

The bankruptcy court declined to take up the declaratory relief and accounting claims, finding that since the § 523 claims failed, it made no sense to adjudicate these claims, since any debt Debtor owed to Singer and SFC arising out the Agreement had been discharged. The court noted that even if it had found that a partnership existed and that Singer and SFC had some entitlement to book or film rights, it did not matter; any prepetition claims arising from the Agreement had been discharged.

The bankruptcy court entered a judgment in favor of Debtor on all claims on June 18, 2015 (the "Judgment").

**3. Singer Parties' motion for reconsideration of the Judgment and appeals**

The Singer Parties moved to alter or amend the Judgment under Civil Rule 59, which the bankruptcy court denied. The Singer Parties then appealed the Judgment to the district court, which entered its affirmance while this appeal was pending. The Singer Parties have appealed the district court's decision to the Ninth Circuit Court of Appeals.

/ / /

-8-

**4. Debtor's motion for attorney's fees and costs**

Debtor moved for attorney's fees and costs of nearly $300,000 against the Singer Parties under § 523(d) ("Fee Motion"). Debtor contended that he met the requirements of § 523(d): a § 523(a)(2) judgment was entered in his favor; and the debt at issue was a consumer debt. Debtor maintained that his debt to Singer and SFC was a consumer debt, as he had incurred it for his personal, family and household living expenses. Additional evidence also established that the debt was consumer debt: (1) Singer told a friend that he lent Debtor money for living expenses; (2) Debtor's attached declaration explained that the advanced funds were used for personal and family expenses; (3) Singer testified in his deposition that the $25,000 per month was an advance to Debtor to live while he wrote the book; and (4) paragraph 8 of the Agreement (that Debtor could receive up to $25,000/month for the months of February and March 2009 for living expenses) established that the advanced funds were for living expenses. Debtor also claimed that the Singer Parties' § 523(a)(2) claims were not substantially justified.

The Singer Parties disputed Debtor's contention that the debt was consumer debt, arguing that the purpose for which the debt was incurred determines whether it is consumer debt and debts incurred with a profit motive are not consumer debts. In this case, Debtor was provided money as part of a business deal, wherein each of the parties anticipated and stood to gain substantial profit from the eventual sale of the Johnny Carson book. Those profits were to be divided within a partnership formed between Debtor and the Singer Parties. The Singer Parties contended that the purpose of the

-9-

transaction was a business transaction to create a profitable business partnership; no loan was given to Debtor merely to provide for personal, family or household purposes.

In reply, Debtor argued that in determining whether a debt is consumer debt for purposes of § 523(d), courts look to the **use** of the debt. Here, argued Debtor, the evidence showed that the $159,388.46 loan to Debtor was incurred for his personal and family expenses; the funds were not used for any profit or business purpose. Debtor disputed the Singer Parties' position that because their § 523(a)(2) claims survived various procedural motions, this proved they were substantially justified. In all circumstances, argued Debtor, SFC had no evidence of any fraud claim under § 523(a)(2). All SFC had established was that it lent money and was a party to a prepetition agreement with Debtor.

**5.    The bankruptcy court's ruling on the Fee Motion**

The bankruptcy court denied the Fee Motion at the hearing on August 11, 2015. It first determined that the advanced funds to Debtor were not consumer debt:

> THE COURT: Now, while the case ultimately found that the debt was a consumer debt, the reasoning of In re Stein [sic] – and that's the BAP case, which was affirmed by the Ninth Circuit – leads me to conclude here that the Debtor has not established that this is a consumer debt. While funds may have been used for living expenses, it's quite clear that debts incurred by the Debtor with a profit motive are not consumer debt. That's the finding of the . . . Stein [sic] case. And my finding here is that these parties entered into some sort of commercial agreement. Whether it was a partnership or not is beside the point. The agreement was made to write and develop the book. There was always a profit motive among the parties with — in connection with the parties' arrangement, in connection with the note signed by the Debtor. This was an arrangement to write and market a book. This was a commercial relationship. This was not a consumer debt.

-10-

Hr'g Tr. (Aug. 11, 2015) 16:13-17:4. The court then determined that the Singer Parties' claims were substantially justified, finding that they had a reasonable factual and legal basis.

Debtor timely appealed the order denying the Fee Motion.

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (O). We have jurisdiction under 28 U.S.C. § 158.

**III. ISSUES**

1. When denying the Fee Motion, did the bankruptcy court err in determining that the advanced funds were not a consumer debt?
2. Did the bankruptcy court abuse its discretion in denying the Fee Motion under § 523(d)?

**IV. STANDARDS OF REVIEW**

A bankruptcy court's denial of attorney's fees and costs under § 523(d) is reviewed for abuse of discretion. See First Card v. Hunt (In re Hunt), 238 F.3d 1098, 1101 (9th Cir. 2001) (citing First Card v. Carolan (In re Carolan), 204 B.R. 980, 984 (9th Cir. BAP 1996)); Stine v. Flynn (In re Stine), 254 B.R. 244, 248 (9th Cir. BAP 2000), aff'd, 19 F. App'x 626 (9th Cir. 2001). The court abuses its discretion if it applied the wrong legal standard or its findings were illogical, implausible or without support in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

Determining whether a debt is consumer or business is a factual question reviewed for clear error. See Aspen Skiing Co. v. Cherrett (In re Cherrett), 523 B.R. 660, 667 (9th Cir. BAP 2014) (implying that a determination of whether a debt is

-11-

"consumer debt" for purposes of § 707(b)(1) is a factual finding reviewed for clear error). But see In re Booth, 858 F.2d 1051, 1053 n.5 (5th Cir. 1988) (whether bankruptcy court correctly classified a debt as consumer or business for purposes of § 707(b) is a legal inquiry and subject to de novo review).

## V. DISCUSSION

### A. Section 523(d)

If a creditor prosecutes an action for an exception to discharge of a debt under § 523(a)(2) and that debt is then ordered discharged by the bankruptcy court, § 523(d) is implicated. That statute provides:

> (d) If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

Section 523(d) was enacted to "curb the abusive practices of consumer finance companies, who often filed bad faith dischargeability actions in the knowledge that the financially straitened debtor would be forced to settle the claim, rather than bearing the expense of a trial on the merits." All Am. of Ashburn, Inc. v. Fox (In re Fox), 725 F.2d 661, 663 (11th Cir. 1984).

To recover attorney's fees under § 523(d), a debtor must prove: (1) the creditor requested a determination of the dischargeability of the debt under § 523(a)(2); (2) the debt is a consumer debt; and (3) the debt was discharged. In re Stine, 254 B.R. at 249; Am. Sav. Bank v. Harvey (In re Harvey), 172 B.R.

-12-

314, 317 (9th Cir. BAP 1994) (citing Chevy Chase, F.S.B. v. Kullgren (In re Kullgren), 109 B.R. 949, 953 (Bankr. C.D. Cal. 1990)). Once these three elements are satisfied, the burden shifts to the creditor to demonstrate that its position was substantially justified. In re Stine, 254 B.R. at 249; In re Harvey, 172 B.R. at 317. A creditor is "substantially justified" in bringing a § 523(a)(2) claim if the claim has a "reasonable basis both in law and in fact." In re Hunt, 238 F.3d at 1103.

**B. The bankruptcy court did not err in determining that the advanced funds were not consumer debt.**

"Consumer debt" is defined in § 101(8) as "debt incurred by an individual primarily for a personal, family or household purpose." This definition is adapted from the definition used in various consumer protection laws. In re Stine, 254 B.R. at 249. The term "consumer debt" is used throughout the Code. See § 524(c)(6)(B) (excepting consumer debts secured by real estate from reaffirmation requirements); § 707(b)(1) (providing for dismissal of chapter 7 cases filed by individual debtors "whose debts are primarily consumer debts" for substantial abuse); § 1301(a) (staying actions against a co-debtor to collect consumer debt). "[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932). Thus, in addition to those cases construing the term "consumer debt" under § 523(d), we may consider cases construing other sections of the Code in which the term "consumer debt" is used. Cypher Chiropractic Ctr. v. Runski

-13-

(In re Runski), 102 F.3d 744, 746-47 (4th Cir. 1996).

"It is settled in this circuit that the purpose for which the debt was incurred affects whether it falls within the statutory definition of 'consumer debt' and that debt incurred for business ventures or other profit-seeking activities does not qualify." Meyer v. Hill (In re Hill), 268 B.R. 548, 552-53 (9th Cir. BAP 2001) (discussing "consumer debt" in § 1322(b)(1)) (citing Zolg v. Kelly (In re Kelly), 841 F.2d 908, 913 (9th Cir. 1988) ("Debt incurred for business ventures or other profit-seeking activities is plainly not consumer debt for purposes of section 707(b)."); In re Cherrett, 523 B.R. at 669 ("courts generally ascribe a **business** purpose, rather than a personal, family or household purpose to debts which are incurred 'with an eye toward profit' and which are 'motivated for ongoing business requirement'") (emphasis in original); In re Stine, 254 B.R. at 249 (a § 523(d) case citing In re Booth, 858 F.2d at 1055, a § 707(b) case, for the proposition that debts incurred by the debtor with a profit motive are not consumer debts).

Other circuits apply a similar "profit motive" or "business venture" test for the determination of consumer debt. See IRS v. Westberry (In re Westberry), 215 F.3d 589, 593 (6th Cir. 2000) (considering "profit motive" test in determining whether income tax debts should be considered consumer debts for purposes of applying the co-debtor stay under § 1301); Citizens Nat'l Bank v. Burns (In re Burns), 894 F.2d 361, 363 (10th Cir. 1990) (§ 523(d) case holding that a credit transaction is not a consumer debt when it is incurred with a profit motive); In re Booth, 858 F.2d at 1055 (Fifth Circuit Court of Appeals discussing "consumer debt" in

-14-

§ 707(b) and holding that a debt is a business debt, as compared to a debt acquired for a personal, family, or household purpose, when it is "incurred with an eye toward profit").

The determination of whether a debt relates to a personal, family, or household purpose or is motivated by profit-seeking is made at the time the debt is incurred. In re Nicolas, 2002 WL 32332461, at *2 (Bankr. D. Haw. Mar. 22, 2002) (citing In re Bertolami, 235 B.R. 493, 497 (Bankr. S.D. Fla. 1999) (holding that mortgage debt incurred for personal residence was a consumer debt notwithstanding its later conversion to commercial use)).

Debtor contends that the bankruptcy court applied an incorrect standard of law for determining whether the advanced funds were a consumer or business debt. Debtor contends that the court improperly relied on Stine — which he argues had nothing to do with defining a consumer or business debt and never defined profit motive — to conclude that the advanced funds were incurred by Debtor with a profit motive and therefore were not consumer debt. While it is true that Stine did not define "profit motive," it did analyze whether the debts at issue were incurred by the debtor for personal, family or household purposes. The Panel concluded that because the debtor had borrowed funds for the purpose of improving her home and incurred further debt when the creditor made mortgage, insurance and tax payments for the home on the debtor's behalf, the debts were "consumer debts" as defined by § 101(8). 254 B.R. at 250.

In any event, we fail to see the point of Debtor's argument. Regardless of what Debtor claims is a "gratuitous statement of

-15-

law" in Stine, that "debts incurred by the debtor with a profit motive are not consumer debts," the rule in this circuit is clear: courts must look to the **purpose** of the debt in determining whether it is "consumer debt," and debt incurred for business ventures or other profit-seeking activities is **not** consumer debt. In re Kelly, 841 F.2d at 913; In re Cherrett, 523 B.R. at 668-69; In re Hill), 268 B.R. at 552-53. Thus, the bankruptcy court did not err when it applied that legal standard.

Nonetheless, despite this circuit's law, Debtor contends that the **use** of the funds is determinative for characterizing whether a debt is a consumer or business debt. Because Debtor "used" the advanced funds to pay his personal expenses, he maintains that the debt is consumer debt. We disagree.

In Cherrett, a recent case by this Panel, we examined the distinction between consumer and business debt in the context of incurring housing debt for a business purpose. The debtor was offered a job by Aspen Skiing Company for high compensation. 523 B.R. at 663. As part of his employment package, he negotiated an interest-free loan of $500,000 from Aspen to purchase a home. In 2007, the debtor borrowed the $500,000 from Aspen to purchase a $1 million home secured by a second trust deed. Id. at 664. The debtor hoped the home would appreciate in value so that when it was sold, he would realize a profit, as he did with his previous home. Id. Things did not turn out as planned. The real estate market greatly declined in 2008, and the debtor eventually left Aspen's employ in 2011. Id.

In moving to dismiss his chapter 7 case under § 707(b)(1), Aspen argued that the home loan was "consumer debt" because the

-16-

debtor had obtained the loan to purchase his personal residence. Id. at 668. Aspen argued that the home loan did not become a "business debt" simply because it was part of the debtor's compensation. Id. at 670. In affirming the bankruptcy court's determination that the home loan was business debt, the Panel ruled that "the key factor in determining whether a debt is consumer debt lies in the **debtor's purpose** in incurring the debt." Id. (emphasis in original). Thus, even though secured debt incurred to purchase or improve a debtor's personal residence is generally consumer debt, Price v. United States Tr. (In re Price), 353 F.3d 1135, 1139 (9th Cir. 2004), the bankruptcy court had properly characterized the home loan as business debt, because the debtor's primary purpose in obtaining the loan was for business as it was an integral part of his employment. In re Cherrett, 523 B.R. at 670-72.

Debtor's contention that "use" of the debt is determinative for characterizing whether a debt is consumer or business debt defies our controlling authority. Even though the debtor in Cherrett obtained the home loan to buy a personal residence, which is generally considered a consumer debt, and he did in fact use those funds to buy it, the **purpose** of the home loan had a business purpose; it was an integral part of the business arrangement between the parties and clearly had a profit motive for the debtor. Applying the standard of "use" Debtor suggests is unworkable. A debtor could convert the character of a debt from business to consumer (and vice versa) by simply using the funds for a purpose different than the original purpose. Plus, it eliminates the court's consideration of the debtor's motive, which

-17-

must be viewed at the time the debt was incurred. In re Nicolas, 2002 WL 32332461, at *2; In re Bertolami, 235 B.R. at 497.

Here, although Debtor testified that the advanced funds were used for his personal expenses and paragraph 8 of the Agreement provides that Debtor could receive up to $50,000 total for living expenses for the months of February and March 2009, it is clear that the **purpose** of the advances to Debtor was for a business enterprise with an eye toward profit. Debtor approached Singer and obtained the loan from SFC for the sole purpose of funding the writing of his book. The parties agreed to split the proceeds if the book sold within six months. SFC advanced funds to Debtor so that he could focus his efforts on writing the book and not have to worry about the pressures of daily finances or about paying others who were involved in its completion (who Debtor did pay with some of the funds). Obviously, the faster Debtor could write the book, the faster the parties could make money, which clearly was the primary purpose of their arrangement. The funds here, not unlike those in Cherrett, functioned as Debtor's compensation during that six-month period.

Therefore, because the debt was incurred with a profit motive, it is not consumer debt. Accordingly, the bankruptcy court did not err in determining that Debtor failed to meet his burden in establishing that the advanced funds were consumer debt. As a result, Debtor was not entitled to attorney's fees and costs under § 523(d). Given this conclusion, we need not decide whether the bankruptcy court correctly concluded that the Singer Parties' § 523(a)(2) claims were substantially justified.

/ / /

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM.